**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EAST COAST ADVANCED PLASTIC SURGERY, LLC and MARCELLA LIVOLSI,<br><br>*Plaintiffs*,<br><br>*-against-*<br><br>CIGNA HEALTH AND LIFE INSURANCE COMPANY; CONNECTICUT GENERAL LIFE INSURANCE COMPANY; and MULTIPLAN, INC.,<br><br>*Defendants*. | **Case No.:**<br><br>**<u>COMPLAINT</u>** |

Plaintiffs East Coast Advanced Plastic Surgery, LLC ("ECAPS") and Marcella Livolsi ("Livolsi," and together with ECAPS, "Plaintiffs"), for their Complaint against Cigna Health and Life Insurance Company ("Cigna "), Connecticut General Life Insurance Company ("CGLIC") (together with Cigna, the "Cigna Payor" or "Cigna"), and MultiPlan, Inc. ("MPI," and together with Cigna Payor, "Defendants"), allege as follows:

## NATURE OF ACTION

1. This is a case about the refusal of health insurance behemoth Cigna to pay what it owes for post-mastectomy breast reconstruction surgeries provided by ECAPS to patients enrolled in Cigna-administered employer health plans. ECAPS is a medical practice that offers complex, highly specialized breast reconstruction surgery to breast cancer patients who have undergone medically necessary mastectomies. It is an out-of-network provider—a provider that has no contract with Cigna or any health plan to provide in-network medical services to plan subscribers at in-network rates agreed to between Cigna and the in-network provider.

2. As an out-of-network provider, ECAPS had no obligation to offer its services to Cigna plan subscribers until MPI, in 2012, proposed that ECAPS join MPI's separate, independent network of out-of-network providers, known as a "preferred provider organization" (PPO) network. MPI, an intermediary in the health insurance market, offered access to its independent PPO networks by contract to Cigna and other group health plan fiduciaries, employer-funded plans, and insurance companies. Cigna and other purchasers benefited by gaining access to MPI's independent networks, which allowed Cigna, in its role as a fiduciary administering an employer health plan, to offer employers expanded networks of specialized providers like ECAPS, who had the skill and expertise Cigna's in-network physicians often lacked.

3. Under ECAPS' contract with MPI, ECAPS was required to provide its specialized breast reconstruction services to members of Cigna-administered employer health plans, in exchange for which Cigna (not MPI) was required to pay ECAPS at the contractually specified rate of 85% of its customary charges. ECAPS provided its services to Cigna plan members, but rarely did Cigna pay for them. Most often Cigna paid a tiny fraction of what it owed under ECAPS' contract with MPI and Cigna's own contract with MPI—or nothing at all. Cigna would falsely claim in Explanations of Benefits sent to patients that Cigna had obtained a 100% discount on ECAPS customary charges and that, in addition to the patient's Cigna administered plan paying nothing, the patient herself also owed nothing for ECAPS' breast reconstruction services.

4. At other times, Cigna would refuse to authorize coverage for the patient's post-mastectomy breast reconstruction surgery services despite that, under its contract with MPI, ECAPS was required to provide those services to Cigna plan members. Cigna would inform ECAPS that it should collect the amount not covered—*i.e.*, the full cost of the services—from the

Cigna plan-covered patient, a practice that was, as Cigna knew, prohibited by ECAPS' contract with MPI and, beginning in 2022, by the federal No Suprises Act. The No Surprises Act mandates that a group insurance plan or plan fiduciary like Cigna "shall pay" an out-of-network provider an "agreed on amount" if there is one—here, the 85% contract rate contained in ECAPS' contract with MPI—and prohibits the out-of-network provider from collecting from the patient the balance of the provider's charges above the patient's cost share established in the patient's health plan.

5. Thus, as of January 1, 2022, Cigna's ongoing breaches of its contractual obligation to pay ECAPS for its surgical services at the 85% contract rate also became unambiguous violations of the No Surprises Act's statutory payment mandate.

6. Nonetheless, Cigna doubled down on its breaches and violations. In April 2023, Cigna informed ECAPS by letter that it would no longer pay *anything* for ECAPS' provision of breast cancer reconstruction services to Cigna plan members. Cigna's letter demanded that ECAPS collect from Cigna members fees for its medical services that exceed the patient's cost sharing amount prescribed by the Cigna plan—including the balance amounts above the plan's in-network allowance. Cigna's demand that ECAPS collect these balance amounts was, again, in direct breach of ECAPS' contract with MPI and the No Surprises Act. The premise of Cigna's April 2023 letter was knowingly false: although ECAPS was an out-of-network provider that was, accordingly, not bound by the terms of Cigna plans or in-network provider agreements, Cigna claimed ECAPS was bound by those terms. Cigna's letter did not cite any authority for its assertion that ECAPS was bound by contracts to which it is not a party.

7. Plaintiff Livolsi is an all too typical example of the real world harms Cigna's breaches and violations have caused breast cancer patients. After being diagnosed with breast

cancer, Ms. Livolsi underwent a mastectomy with an in-network breast cancer surgeon, followed immediately by a breast reconstruction surgery by an ECAPS surgeon working in tandem with the in-network surgeon. Despite extensive efforts by both her in-network surgeon and ECAPS and multiple appeals, Cigna refused to pay any of the cost of the reconstruction portion of Ms. Livolsi's surgery.

8. Cigna's refusal to pay for Ms. Livolsi's reconstruction surgery as required by Livolsi's health plan and ECAPS contract also violated a longstanding federal law, the Women's Health and Cancer Rights Act of 1998 (WHCRA), which was enacted as a statutory amendment to ERISA. Under the WHCRA, employer health plans that provide coverage for mastectomies, as Livolsi's did, must provide coverage for breast reconstruction related to the mastectomy. Cigna's denials of coverage for her reconstruction surgery therefore violated both the terms of Ms. Livolsi's Cigna-administered health plan and the WHCRA.

9. Cigna's continuous breaches and violations are knowing and intentional: Cigna knows what its contractual obligations are and what federal law requires. Those breaches and violations have caused more than $300 million in damages to ECAPS and imposed steep and unexpected financial burdens on Ms. Livolsi, for expenses that should have been covered by her Cigna-administered health plan.

10. To redress these and other violations described below, the Court should award the full measure of relief Plaintiffs seek.

## PARTIES

11. ECAPS is a limited liability company created under New Jersey law to engage in the practice of medicine. ECAPS maintains medical offices in New York City and in northern

New Jersey. ECAPS physicians are licensed by the states of New York and New Jersey to perform, among other things, highly specialized breast reconstruction surgeries.

12. Livolsi is an employee-participant under a self-funded group health plan created by her New York City-headquartered employer BrainPOP, LLC (the "Livolsi Plan"). Livolsi lives in New Jersey.

13. Cigna is a corporation organized under Connecticut law with a principal place of business in Bloomfield, Connecticut. Upon information and belief, a core component of Cigna's operations relates to its status as an insurance company that offers and provides, among other lines of business, health insurance-related services and/or employee health claim administration services, to commercial employers and their employees located in New York, New Jersey, and throughout the United States. Cigna is a wholly owned subsidiary of defendant CHLIC.

14. CHLIC is a corporation organized under Connecticut law with a principal place of business in Bloomfield, Connecticut. Upon information and belief, a core component of CHLIC's operations relates to its status as an insurance company that offers and provides, among other lines of business, health insurance and employee health claim administration services, to commercial employers and their employees located in New York, New Jersey, and throughout the United States. CHLIC, while wholly owning Cigna, is itself a wholly owned subsidiary of Connecticut General Corporation, which in turn is a wholly owned subsidiary of Cigna Holding Company, which in turn is a wholly owned subsidiary of The Cigna Group (formerly known as Cigna Corporation), a public corporation.

15. Defendant MPI is a corporation organized under Delaware law with a principal place of business in Manhattan, New York City. Upon information and belief, a core component

of MPI's operations relates to its status as a PPO whereby (a) MPI assembles networks of medical providers that are contractually obligated to provide their medical services to group health plan members associated with MPI's clients, who are administrators or insurers of group health plans, and (b) MPI sells those clients access to its contractually created provider networks, in return for which MPI's clients agree to pay the medical providers in MPI's network for services provided to the client's group health plan members at a discounted rate specified by contract.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims for relief arising under provisions of the Employee Retirement Income Security Act of 1974 (ERISA). First, ECAPS asserts claims for relief under the federal No Surprises Act of 2020, Pub. Law 116-260, 134 Stat. 1182 (Dec. 27, 2020), effective as of January 1, 2022 (the "NSA"), as a statutory amendment to Section 716 of ERISA (as well as to portions of the Internal Revenue Code and the Public Health Service Act), codified at 29 U.S.C. § 1185e. In addition, Livolsi asserts a claim for relief under 29 U.S.C. § 1132(a)(3), a provision of ERISA authorizing private civil actions by plan beneficiaries against plan fiduciaries like Cigna.

17. This Court has supplemental jurisdiction over ECAPS' state law claims under 28 U.S.C. § 1367(a) because those claims are so related to ECAPS' federal statutory claims that they form part of the same case or controversy under the United States Constitution.

18. This Court has personal jurisdiction over the Cigna Payor (Cigna and CGLIC) because each of these Defendants is registered to do business in New York, and, as set forth below, each of these Defendants also: (a) transacts business within New York; (b) supplies health claim benefit administration services (and/or insurance-related services) to commercial employers and

their employees within New York in connection with group health plans; (c) committed tortious acts within New York in violation of federal statutory duties that apply to their supply of health claim benefit administration services (and/or insurance-related services) to commercial employers and their employees within New York in connection with group health plans; (d) as alleged in subsection (c), committed tortious acts outside New York causing injury within New York, and regularly does and solicits business, and persistently interacts with, customers and medical providers within New York , and/or (e) derives substantial revenue from services rendered within and/or to New York and/or expects or should reasonably expect its extensive business activities rendered within and/or to New York to have consequences in New York and derives substantial revenue from its activities in interstate commerce.

19. This Court has personal jurisdiction over MPI because it (a) is a corporation headquartered in New York with its principal place of business in New York; (b) transacts extensive business within New York and supplies its services within New York; (c) has committed acts within New York that violate its contractual duties to ECAPS; and/or (d) derives substantial revenue from services rendered within New York and/or expects or should reasonably expect its extensive business activities rendered within New York to have consequences in New York and derives substantial revenue from its activities in interstate commerce.

20. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), because: (i) at least one defendant resides in this District and all defendants are deemed to reside in New York State under 28 U.S.C. § 1391(b)(1) and (c)(2); and/or (ii) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### A. ECAPS's Specialized Breast Cancer Patient Reconstruction Practice

21. ECAPS was founded in 2011, when two of its physicians opened a medical office in northern New Jersey to offer specialized breast cancer reconstruction services to women in connection with medically necessary mastectomies. ECAPS' two co-founding surgeons are board-certified by the American Board of Surgery and the American Board of Plastic Surgery and are ranked by those associations in the top 1% of the country for their surgical expertise in breast cancer reconstruction.

22. Prior to forming ECAPS, ECAPS' founding surgeons received highly specialized training at, and earned a Microsurgery Fellowship from, the Division of Plastic and Reconstructive Surgery at the Medical University of South Carolina, where they acquired microsurgical breast reconstruction expertise under the direct supervision of a nationally acclaimed pioneer in the highly complex field of breast reconstruction microsurgery known as a Deep Inferior Epigastric Artery Perforator Flap ("DIEP Flap").

23. When performed by ECAPS' specialty-trained breast cancer reconstruction surgeons, the DIEP Flap microsurgery provides ECAPS' breast cancer reconstruction patients with medically-established benefits that do not accrue from other types of breast cancer reconstruction surgeries. Those benefits include—though are not limited to—the following:

(a) Medical benefits from natural tissue breast reconstruction: Since the DIEP Flap microsurgery reconstructs the breasts using tissue from the patient's lower abdomen, the DIEP Flap microsurgery, as performed by ECAPS surgeons, does not risk an

allergic reaction from the patient's body, as can occur with an alternative type of surgery involving breast implants;

(b) Medical benefits from greatly reduced risk of surgical complications: Since the DIEP Flap microsurgery does not introduce foreign objects into the patient's body, the DIEP Flap microsurgery, as performed by ECAPS surgeons, does not risk the medical complications that can arise from breast implant surgery, such as ruptured implants and capsular contraction. ECAPS patients receive significant medical benefits from this greatly reduced risk of surgical complications; and

(c) Medical benefits from long-lasting, and typically permanent, medical outcomes: Unlike breast implant surgery, which can require replacement-implants and an additional surgery every 10-15 years, a DIEP Flap microsurgery, as performed by ECAPS surgeons, provides patients with long-lasting, indeed permanent, results requiring no further corrective surgery.[1]

24. Soon after ECAPS opened its doors, word spread through the breast cancer community of the superior expertise of ECAPS microsurgeons and the stellar outcomes they achhieved for their patients. In subsequent years, hundreds of new patients have sought treatment from ECAPS annually.

25. ECAPS performs its specialized breast reconstruction surgeries at various hospitals and medical facilities, including seven (7) Breast Cancer Centers of Excellence that ECAPS has helped to establish in the geographical region encompassing Manhattan and northern New Jersey.

[1] ECAPS uses additional innovative microsurgery techniques for breast reconstruction, including, for example, the TRAM Flap and TUG Flap procedures, both of which also offer the benefits noted above of using tissue from another area of the patient's body to reconstruct the breast.

Over the last thirteen (13) years, ECAPS has significantly expanded its surgical practice, currently comprising nine (9) full-time surgeons and seven (7) full-time physician assistants. ECAPS' microsurgical expertise has helped thousands of women who have undergone medically necessary mastectomies work toward regaining their physical and emotional health as well as their identity and sense of self.

### B. ECAPS' May 2012 Contract With Defendant MPI

26. ECAPS has always provided its specialized medical services to patients as an independent and out-of-network healthcare provider. ECAPS has never entered into a direct contractual relationship, or direct in-network provider contract, with any group health plan established by any patient's employer.

27. This fact is significant, as will be seen below, since it means that ECAPS is not bound by any language or terms in any group health plan contract between a commercial employer and its employees.

28. In an effort to make its specialized medical services more widely available to post-mastectomy patients, in May 2012 ECAPS entered into a written contract to become an out-of-network provider within a network of medical providers that Defendant MPI assembled based on its operations as a preferred provider organization (the "MPI-PPO Network" or "MPI Network").

29. As a core component of MPI's operations as a PPO, MPI (a) assembles networks of medical providers that are contractually obligated to provide their medical services to patients (and other health plan members) associated with MPI's "Clients" and "Users" (as defined below but typically group health plans and their fiduciaries), and (b) sells access to the MPI-PPO Network

to MPI's Clients and Users via contracts that allow the health plan or its fiduciary to provide plan members with access to medical services offered by the providers in the MPI-PPO Network.

30. To understand what it means for ECAPS to provide its medical services as an independent and out-of-network provider to patients eligible to receive breast cancer reconstruction coverage under their employer health plan contracts, it is necessary to understand the basic aspects of how those employer-employee group health plan contracts work.

i) Background On Employer-Sponsored Group Health Plans

31. Under ERISA, commercial employers may sponsor, create, and establish a group health plan that contractually provides healthcare coverage benefits to their employees (defined as "plan-participants" under ERISA) and their authorized family members and dependents (defined as "plan-beneficiaries" under ERISA), pursuant to terms and conditions set forth in those group health plans (a "Plan" or "Plan-Contract"). Plan-Contracts cover an array of medical, hospital, surgical, prescription-drug, pharmaceutical, and other health-related costs for employees and their families.

32. Although there are exceptions, a commercial employer that sponsors the creation of a Plan will also commonly designate itself, or allow itself to be designated under ERISA, as a "Plan Administrator." A Plan Administrator is legally responsible under ERISA to act on behalf of the Plan, and in accordance with the terms and conditions in the Plan-Contract, as superseded by applicable statutes, when administering healthcare benefits under the Plan-Contract to employees and their family members.

33. Some commercial employers may offer their employees a choice from among multiple Plans they have sponsored and created, which may differ from each other in the amount employees must contribute in premiums to obtain coverage under their employer's Plan.

34. Plans can be either self-funded (also known as self-insured) or fully-insured. A self-funded plan is one in which the employer itself uses its own funds to pay the costs of its employees' medical care. In a fully-insured plan, the employer purchases a group health insurance policy from a health insurance company, pursuant to which the employer pays premiums to the health insurance company, and the insurance company is directly responsible to use its own funds (not the employer's funds) to pay the costs of employees' medical care.

35. Upon information and belief, all or almost all of the employer-sponsored group health plans that are at issue in this lawsuit, and that are administered by the Cigna Payor (as described below), are employer self-funded Plans.

36. In a contract known as a third-party administration agreement ("TPA") or administrative services only agreement ("ASO"), a self-funded plan, through its Plan Administrator, typically contracts with a third-party Claims Administrator, such as the Cigna Payor, and delegates to the Claims Administrator the discretionary power to administer all aspects of the benefits provided under the Plan. Pursuant to the TPA or ASO, the Claims Administrator is empowered to handle, among other things, the processing of all claims for healthcare benefits by Plan participants and beneficiaries.

37. Pursuant to the TPA or ASO for an employer self-funded Plan, the Cigna Payor, as Claims Administrator, exercises discretionary control over all aspects of Plan administration relating to employee healthcare claims, including but not limited to, the power to (a) determine

whether an employee claim will (or will not) be treated as covered by the Plan, and (b) in the event that an employee healthcare claim is treated as covered by the Plan, to determine the amount of Plan funds the Plan will (or will not) pay to reimburse the provider of the covered healthcare services.

38. Since the TPA or ASO for an employer self-funded Plan entrusts the Cigna Payor, as Claims Administrator, with discretionary control over all aspects of Plan administration regarding employee healthcare claims (and over the use and disposition of Plan funds to pay or not pay such claims), ERISA, which regulates the Plan, statutorily imposes fiduciary duties on the Cigna Payor, as Claims Administrator, (a) to act "solely in the interest" of Plan participants such as Livolsi and "for the exclusive purpose of providing benefits" to Plan employees such as Livolsi, 29 U.S.C. § 1104(a), and (b) to act "in accordance with the documents and instruments governing the plan" but only "insofar as" they "are consistent with the [statutory] provisions of this subchapter" as amended. 29 U.S.C. § 1104(d).

39. One key reason that a commercial employer, as a plan sponsor and plan administrator for a self-funded plan, chooses to enter into a TPA or ASO with a Claims Administrator (like the Cigna Payor) is so that the Plan's participants and beneficiaries have access to the Claim Administrator's medical provider network.

40. Significantly, however, the access rights of participants and beneficiaries to the Claim Administrator's medical provider network are subject to, and governed by, preexisting contractual requirements contained in separate contracts between, on the one hand, the doctors in that medical provider network and, on the other hand, the Claims Administrator, here Cigna Payor (an "In-Network Provider Agreement").

41. As an out-of-network provider, ECAPS has never entered into an In-Network Provider Agreement with Cigna Payor, or any other Claims Administrator for an employer-sponsored group health plan, and accordingly, is not bound by any language or terms in any Plan-Contract between a commercial employer and its employees. Rather, ECAPS has always provided its specialized medical services to patients as an independent and out-of-network healthcare provider that lacks a direct contractual relationship with those patients' Plans and the Plan administrators like Cigna Payor.

ii) <u>The Contract Between MPI And ECAPS: Definitions</u>

42. Effective May 15, 2012, ECAPS and MPI entered into a contract entitled "MPI Participating Professional Group Agreement" (the "MPI Contract"). A true copy of the MPI Contract is attached as Exhibit 1 to this Complaint. As described below, the Cigna Payor is contractually-defined as an MPI "Client" or "User," and ECAPS' central obligation under the MPI Contract is to provide medical services to participants and beneficiaries covered by Cigna-administered Plans ("Cigna Participants"), in exchange for which the Cigna Payor (not MPI) is contractually required to pay ECAPS a contractually-defined "Contract Rate," defined as 85% of ECAPS's billed charges. .

43. The MPI Contract creates defined terms that cover the Cigna Payor in its roles as a Claims Administrator of an employer self-funded plan and/or an insurer ("Insurer") of an employer fully-insured plan: "Client means *an insurance company*, employer health plan, Taft Hartley Fund, or an organization that sponsors Program(s) [defined to include any employer health plan], *administers Program(s) on behalf of a User or otherwise provides services to a User regarding such Programs*." *Id*. (emphasis added). MPI Contract ¶ 1.4. The term "User" "means any

corporation . . . employer *or any other entity responsible for the payment of Covered Services*, entitled to access to the Contract Rate under this Agreement. *Client may also be a User*." *Id*. ¶¶ 1.15 (emphasis added). Thus, the Cigna Payor is an MPI "Client" because it administers Plans on behalf of employers (*i.e*., "Users"); and provides services to employers regarding their Plans. The Cigna Payor is also a "User," since it is a corporation, and since it is an entity responsible for making payment for Covered Services and entitled to make those payments at the Contract Rate, which as shown below is 85% of ECAPS' billed charges. There is no contractual bar to Cigna Payor being understood as both a Client and as a User; as noted, the MPI Contract expressly states that "Client may also be a User." *Id*. ¶¶ 1.15.

44. The MPI Contract also creates defined terms relating to ECAPS' contractual obligations. "Covered Services," for which a Client or User is required to pay as explained below, means "medically necessary health care treatment . . . rendered by a Network Provider and provided to a Participant for which a User is responsible for payment pursuant to the terms of a Program [*i.e*., a group health plan]." *Id*. ¶¶ 1.8 and Exhibit A to MPI Contract, 1.14.[2] In the MPI Contract, "Network Provider" is defined as a provider that agrees to provide services to Participants under a Plan "and has been *independently contracted* for participation" in a network

---

[2] At all relevant times, Cigna Payor has considered post-mastectomy breast reconstruction surgery to be medically necessary. *See*, *e.g*., https://static.cigna.com/assets/chcp/pdf/coveragePolicies/medical/mm_0178_coveragepositioncriteria_breast_reconstruction_follow_mast_lump.pdf, at page 2 (last visited Jan. 10, 2025). In any event, as described further below, since enactment of the Women's Health and Cancer Rights Act of 1998, any Plan that provides coverage for mastectomies is also required to provide, and may not deny, coverage for breast reconstruction surgery following a mastectomy, and this federal statute has the effect of statutorily directing that post-mastectomy breast reconstruction be considered medically necessary. *See* 29 U.S.C. § 1185b(a), (c), and *infra*.

of providers "*created or maintained by MPI*, or one of its subsidiaries." *Id*. ¶¶ 1.11, 1.10 (emphasis added). Thus, a Network Provider is a healthcare provider *that contracts with MPI—not* a healthcare provider that contracts with a Claims Administrator, Plan, Insurer, or employer. A Network Provider is therefore separate and distinct from a healthcare provider that is already in *the Plan's* network by virtue of a direct contract between that healthcare provider and a particular Plan, *i.e.*, by virtue of an In-Network Provider Agreement. A "Network Provider" is instead part of a separate and independent "Network," a contractually defined term meaning the separate network "created or maintained by MPI, or one of its subsidiaries" under which Network Providers provide healthcare services. *Id*. ¶ 1.10. The "Network" as defined in the MPI Contract is also referred to in this Complaint as the MPI-PPO Network or the "MPI Network," as defined above.

45. By entering into the MPI Contract, ECAPS became an MPI Network Provider as defined in the MPI Contract.

46. Through the MPI Contract, the Cigna Payor obtained the ability to provide Cigna Participants with access rights to out-of-network ("OON") providers who, despite being outside of a Plan's network, agreed to deliver healthcare services to Plan-members, as part of *MPI's* Network, in return for payment by the Cigna Payor of the 85% Contract Rate under the MPI Contract. Upon information and belief, these contractually-acquired access rights were very important to the Cigna Payor because Plans administered or insured by Cigna Payor ("Cigna Payor Plans") had only minimal, if any, specialist doctors capable of providing the specialized breast reconstruction services provided by ECAPS.

iii) The Contract Between MPI And ECAPS: ECAPS Provides Medical Services To Cigna Participants In Exchange For Payment By The Cigna Payor Of The 85% Contract Rate

47. As noted, the central bargain under the MPI Contract was that ECAPS would provide its health care services to Cigna Participants in exchange for which the Cigna Payor would pay the 85% Contract Rate to ECAPS.

48. ECAPS, contractually defined as "Group," agreed that the practice and its doctors "will render medical and health care services in a manner which assures availability, adequacy and continuity of care to Participants." MPI Contract ¶ 3.2. ECAPS was to "remain solely responsible for the quality of health care services provided by Group" and its doctors "to Participants" in accordance with accepted practices and standards. *Id.* Further, nothing in the MPI Contract granted MPI or Client (*i.e.*, Cigna Payor) "the right to govern the level of care of a patient." *Id.* A "Participant," to whom ECAPS was required to render medical and health care services, was defined as an employee and her covered family member(s)) "eligible under a Client's" Plan that provides access to the MPI Network.

49. Thus, under this provision, ECAPS was contractually required to render medical services, at a level to be determined in its sole discretion, to participants and beneficiaries covered by a Cigna Payor Plan so long as that Plan provided access to the MPI Network. In fact, all Cigna-administered Plans did have access to MPI's Network and to ECAPS as an OON provider that was a member of MPI's Network, based on a contract between MPI and the Cigna Payor, discussed further below.

50. The MPI Contract also barred ECAPS from "differentiat[ing] or discrminat[ing] against Participants in the provision of health care services," and required the practice to "render

such health care services to all Participants in the same manner, in accordance with the same standards, and with the same availability as offered to" ECAPS' other patients. *Id*. ¶ 3.3. ECAPS was required to "use reasonable efforts to accept all Participants for treatment in accordance with the terms and conditions of this Agreement," and was required to provide notice if ECAPS or one of its doctors limited their practice. *Id*. ¶ 3.4.

51. Section 5.2 of the MPI Contract addresses "Payment for Covered Services." Using the mandatory terms "shall" and "will", the MPI Contract requires, in all cases, direct payment by the Client or the User (rather than by MPI) to ECAPS. The timing of payment depends on whether or not the Client (*i.e.*, the Cigna Payor as Claims Administrator of a self-funded plan) is subject to laws governing timely payment of claims. Thus, where the Cigna Payor is subject to such laws, it must comply with them as to the timing of payment:

> Except as set forth in Section 5.3 and 5.4(b) herein [relating to disputed claims and a subset of Participants enrolled in non-insurance programs not relevant here], for those Clients subject to state or federal law with regard to timely payment of claims, *Client shall pay or arrange for User to pay Group* the Contract Rate for Covered Services per the requirements of such state or federal law, and shall be subject to any interest and/or penalties under such law.

Paragraph 5.2(a) (emphasis added).

52. Paragraph 5.2(b) of the MPI Contract, addressing a situation where the Cigna Payor is not subject to laws governing the timing of payment, requires payment within 30 days:

> Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients that are not subject to the state or federal law with regard to timely payment of claims, *Client will pay or arrange for User to pay Group* the Contract Rate for Covered Services within thirty (30) business days of receipt of a Clean Claim and in accordance with the terms of this Agreement.[3] In the event that a Clean Claim

[3] The MPI Agreement defines a "Clean Claim" as a billing format that contains "all information reasonably required by the Client for adjudication." MPI Contract ¶ 1.3.

> is not paid within thirty (30) business days from the date of receipt of such Clean Claim, Group has the right not to honor the Contract Rate.

(emphasis added)

53. Cigna Payor's direct payment obligations to ECAPS, in short, are clear: it must directly pay ECAPS, or otherwise arrange for the employer-plan "User" to pay, at the Contract Rate (explained in the next paragraph) within 30 business days of receiving ECAPS' claim for payment, or within the time provided by law. In practice, for Cigna Payor Plans that are self-funded by an employer, it was Cigna Payor (as a contractually-defined "Client" and/or "User"), and not the underlying employer, that assumed direct contractual responsibility for paying ECAPS' claims.

54. The Contract Rate at which ECAPS was required to be paid is defined as "the rates of reimbursement to the Group for Covered Services, as set forth in Exhibit D." *Id*. ¶ 1.6. Exhibit D in turn states that the Contract Rate "shall be equal to eighty-five (85%) of Group's Billed Charges, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in" the Participant's Plan. *Id*. at Exhibit D, ¶ 2.1. "Billed Charges" is defined as "the fees for a specified health care service or treatment routinely charged by the Group regardless of payment source," MPI Contract ¶ 1.2—*i.e.*, ECAPS' usual and customary fees charged to patients not covered by the MPI Contract.

55. ECAPS has 180 days from the date it rendered services to a Participant to submit a claim for payment. *See* MPI Contract ¶ 5.1, and Exhibit A to MPI Contract, at ¶ 3 (relating to paragraph 5.1 of contract). The amount of the claim was required to be ECAPS' Billed Charges, *i.e.*, its usual and customary charges for the service provided. ECAPS was required to submit its claims directly to Cigna Payor, not to MPI. ECAPS did so through a centralized electronic claim

submission system, through which ECAPS directed its OON provider claims to Cigna Payor for all Cigna Payor Plans used by an ECAPS patient.

56. In sum, under the MPI Contract, ECAPS agreed to provide its breast cancer reconstruction services, as an OON provider, to patients covered by a Cigna Payor Plan. In exchange, Cigna Payor, as the Client or User under the MPI Contract, was required to pay ECAPS 85% of its customary fees charged for its breast cancer reconstruction services, minus any co-payments, deductibles, or co-insurance the employee was obligated to pay under the terms of the Plan. When ECAPS rendered the contractually required medical services—the quality and level of which were exclusively the responsibility of ECAPS and its doctors—it delivered "Covered Services" as defined in the MPI Contract, which triggered Cigna Payor's obligation to pay the contractually-defined Contract Rate of 85% of ECAPS' billed charges. There was no further contractual condition, beyond ECAPS' delivery of the contractually required medical services to a Cigna Participant, on ECAPS's contractual right to receive payment and Cigna Payor's obligation to make that payment at the 85% Contract Rate.

57. ECAPS electronically submitted its claims for payment directly to Cigna Payor and, except in cases of timely disputed claims, Cigna Payor was contractually required to pay an ECAPS claim within those 30 days (or within the time required by law). MPI Contract ¶ 5.2.

iv) <u>The Contract Between MPI And ECAPS: Cost-Share Billing Of Participants</u>

58. Under the MPI Contract both ECAPS and Cigna Payor had a role in the process for billing participants and beneficiaries for co-pays and other cost-sharing components for which Participants are responsible under their Plans.

59. Under Paragraph 5.4(a) in the MPI Contract, ECAPS was required to "bill or collect from a Participant all Co-payments, if any, as specified in the Participant's Benefit Program [Plan] for Covered Services."[4] In addition, "[f]ollowing the receipt of an explanation of benefits from the Client [Cigna Payor]", ECAPS was required to bill or collect from a Participant" "the Deductible or Co-insurance, if any, as specified in the Participant's" Plan. MPI Contract ¶ 5.4(a).[5] Other than as specified in those provisions (and another not relevant here), ECAPS was not permitted to "bill or require any Participant to tender any payment" for services ECAPS provided to the Participant. *Id.* ¶ 5.4(c).

60. Paragraph 5.4(a) in the MPI Contract includes two important terms. First, ECAPS was required to either "bill *or* collect from" Participants all co-payments, deductibles, and/or co-insurance amounts. The disjunctive "or" means ECAPS' obligation was one or the other—to bill or collect from the Participant—but not both. In addition, as the language in Paragraph 5.4(a) makes clear, ECAPS required sufficient information about a Participant's Plan in order to "bill or collect from" the Participant her cost-share portion of ECAPS' charges for which she was responsible under her Plan. Since ECAPS, as an OON provider, was not a party to any Plan-Contract between an employer and its employees, ECAPS had to seek cost-share information from

---

[4] "Co-payment" is defined as "an expressed dollar amount for a given Covered Service, which is required to be paid by the Participant typically at the time of service under the terms of the Participant's [Plan]. *Id.* ¶ 1.7.

[5] "Deductible" is defined as "the amount a Participant is required to pay in accordance with the Participant's [Plan] before a claim for benefits by the Participant is eligible for reimbursement by a User." MPI Contract ¶ 1.9. "Co-insurance" is defined as "an amount that the Participant is responsible for paying in accordance with the terms of the Participant's [Plan] other than a Co-payment or Deductible." *Id.* ¶ 1.5.

Cigna Payor, the only authoritative source of information on calculating a Participant's cost-share obligations.

61. As to the Deductibles and Co-insurance, ECAPS was not required to "bill or collect from" a Plan member until ECAPS received an "explanation of benefits from the Client." MPI Contract ¶ 5.4(a). This condition on ECAPS' obligation to bill the patient for Deductibles, Co-Pays and Co-insurance makes sense because, again, as an OON provider, ECAPS has no information on the patient's cost-sharing obligations under her Plan. In practice, it was difficult and at times impossible to obtain accurate co-payment and other patient cost-sharing information from Cigna Payor. The patient's actual cost-sharing obligations and other information reflected in explanations of benefits ("EOB") generated by Cigna Payor were often inaccurate, or knowingly false, such as in the array of instances in which the Cigna Payor misrepresented to the patient that the Cigna Payor had purportedly obtained a 100% discount from ECAPS and, therefore, the patient had a zero cost-share payment.[6]

62. As explained above, the MPI Contract was not structured to impose any condition on Cigna Payor's required 85% Contract Rate payment to ECAPS in return for ECAPS' provision of Covered Services to a patient covered by a Cigna-administered plan. Thus, the billing or collection by ECAPS of any cost-share sum to a patient was not expressly made a condition on Cigna Payor's (as Client or User) contractual obligation to pay the 85% Contract Rate to ECAPS in exchange for ECAPS' delivery of medical services.

[6] In some cases ECAPS was able to ascertain that the zero cost-share payment on the EOBs was accurate.

v) <u>The Contract Between MPI And ECAPS: Disputed Claims</u>

63. The MPI Contract provided that disputed claims would be resolved directly between Cigna Payor, as Client or User, and ECAPS.

64. Cigna Payor had the right, within 30 business days of receiving a claim from ECAPS, to notify ECAPS in writing of any "dispute with the claim." MPI Contract ¶ 5.3(a). Cigna Payor was required to pay ECAPS "for all portions of the claim not in dispute." *Id*. ECAPS had 180 days following receipt of payment from Cigna Payor to challenge the payment. *See id*.

65. Finally, any disputes arising under the MPI Contract "related to the payment of a claim by" Cigna Payor, as "Client or User," had to be "referred directly to" Cigna Payor for resolution. *Id*.

vi) <u>The Contract Between MPI and ECAPS: MPI's Limited Obligations And Role As Contracting Agent On Behalf Of Cigna Payor</u>

66. As the provisions of the MPI Contract described above make clear, in contracting with ECAPS, MPI was acting as Cigna Payor's contracting agent and/or contracting representative and/or contracting conduit.

67. The substantive obligations and rights in the MPI Contract run directly between ECAPS and Cigna Payor, as Client and/or User, rather than between ECAPS and MPI. Those include ECAPS' obligation to provide medical treatment to Participants in Cigna Payor Plans, in exchange for Cigna Payor's obligation to pay ECAPS at the 85% Contract Rate; ECAPS' obligation to submit claims to Cigna Payor and Cigna Payor's obligation, as Client or User, to pay the claims; ECAPS' and Cigna Payor's obligations to resolve disputes over claims directly between them; and ECAPS' obligation to bill Participants a cost-share sum only after Cigna Payor

provides ECAPS with an explanation of benefits containing properly-communicated cost-share information.

68. In keeping with the substance of the MPI Contract as one in which MPI is acting as Cigna Payor's contracting agent, MPI's obligations under the contract are necessarily limited and extend mostly to ensuring that the Cigna Payor takes steps necessary to fulfilling the purpose of the contract. Thus, for example, MPI agreed to "require Clients and its Users to use the Contract Rates agreed to in this Agreement." MPI Contract ¶ 4.7. MPI agreed it would "require Clients to provide a mechanism encouraging direction of Participants to Network Providers" such as ECAPS. MPI Contract ¶¶ 4.7, 4.6. MPI agreed that it "will require Clients to furnish Participants with a means of identifying themselves to [ECAPS] as covered under" a Client-administered Plan for which Participants thereunder seek services from ECAPS as an OON provider. *Id.* ¶ 4.5. MPI agreed to "post to the MPI website a list of the Clients that have purchased the Network ("Client Listing")," thereby allowing ECAPS to see the identity of the MPI Clients, as claim payors, from whom ECAPS would have a contractual right to receive payment at the 85% Contract Rate.

69. Equally significant, MPI affirmatively represented in the MPI Contract that MPI had "entered into agreements with Clients" providing that the Client's "right to access" MPI's OON providers (such as ECAPS) "shall be subject to the terms of" the MPI Contract. *Id.* ¶ 4.3. In other words, if Cigna Payor makes ECAPS' services available to Cigna Participants, Cigna Payor will be bound by the terms of the MPI Contract, including the obligation to pay the 85% Contract Rate to ECAPS in return for ECAPS' delivery of OON healthcare services to Cigna Participants. This provision makes Cigna Payor directly liable to ECAPS for those obligations under the MPI Contract—in addition to Cigna Payor being liable as a result of MPI's agency status.

70. In addition, ECAPS is an intended third-party beneficiary of MPI's separate contract with Cigna Payor (as "Client") because that contract (which has never been furnished to ECAPS by MPI or Cigna Payor), according to paragraphs 4.3 and 4.7 in the MPI Contract, necessarily mandates that Cigna Payor must comply with the contractual payment obligations to ECAPS in the MPI Contract.

71. Further, the MPI Contract expressly disclaims any responsibility for any core claim administration and claim-payment functions that the MPI Contract expressly assigns to Cigna Payor as Client or User. Thus, the MPI Contract expressly states that MPI "does not determine benefits eligibility"—and therefore MPI could not provide ECAPS with information on Participant cost-sharing that ECAPS needs in order to bill or collect a proper cost-sharing sum from patients. *Id*. ¶ 4.1. MPI also expressly states that it is "not liable for the payment of services" in return for ECAPS delivering healthcare to Cigna Participants, *id*., and instead the MPI Contract makes Cigna Payor (and other MPI Clients and Users) expressly liable for such payment.

72. In sum, in the MPI Contract MPI acted as a contracting agent on behalf of Cigna Payor, a disclosed principal— as an MPI Client or User— who was fully identified to ECAPS. The MPI Contract states that MPI would make known to ECAPS who the Clients are by posting "a list of the Clients" "to the MPI website." *Id*. ¶ 4.4. Even apart from this provision, MPI had to, and did, inform ECAPS who its Clients were since ECAPS had to know which Participants it was obliged to treat and had to submit claims for payment directly to Clients. Thus, ECAPS knew from the time it entered into the MPI Contract that Cigna Payor was a MPI Client and User as defined in the agreement. MPI, in entering into the MPI Contract with ECAPS, was an agent of a disclosed principal.

vii) The Contract Between MPI and ECAPS: Selected General Provisions

73. The MPI Contract provides that the agreement can be modified or amended "upon written agreement executed by both parties." *Id*. 9.2(b).

74. Although section 9.2(a) in the MPI Contract purportedly allows MPI by "written notice" to unilaterally modify or amend the agreement, it also withholds any such unilateral power to modify or amend when "otherwise required by this Agreement." In other words, MPI has no power to unilaterally modify or amend the MPI Contract when the purported exercise of any such unilateral power would violate another provision in the agreement. As set forth below, there are two independent reasons contained in other provisions of the MPI Contract that each prohibit MPI from unilaterally modifying or amending the agreement.

75. First, section 9.4 in the MPI Contract directs that "This Agreement is subject to any requirements or prohibitions of relevant state and federal laws and regulations" and, in particular, states that "MPI will comply with" all of the "coordinating provisions – State/Federal laws" that are "contained in Exhibit C." Section I in Exhibit C to the MPI Contract, captioned "Scope," directs that "To the extent of any conflict between the Agreement and this State Law Coordinating Provisions ("SCLP") Exhibit, this SLCP Exhibit shall supersede, govern and control to the extent required by federal and/or state law and to the extent that MPI, Network Provider and/or Client are subject to such federal or state law."

76. The New Jersey Legislature statutorily regulates a preferred provider organization, such as the MPI Provider Network, as a type of "organized delivery system" (ODS) in connection with the delivery of health care services. *See* N.J.S.A. 17:48H-1 to H-36 containing the statutory provisions for "[a]n act concerning organized delivery systems for health care services or

benefits." The website for the New Jersey Department of Banking and Insurance (DOBI) states that "Examples of the types of entities that are an ODS include preferred provider organizations (PPOs)"[7] and expressly identifies MPI as an ODS that DOBI has formally "certified" for the delivery of health care services. *Id*. (page 3). According to the New Jersey Legislature, a certified ODS, such as the MPI Provider Network, "shall be subject to the Health Care Quality Act" [codified at N.J.S.A. 26:2S-1 *et seq*.] "and the regulations promulgated thereunder." *See* N.J.S.A. 17:48H-33 captioned "Applicability of health care quality act."

77. Title 11, chapter 24B, subchapter 5 in the New Jersey Administrative Code contains the state regulations applying the Health Care Quality Act to an ODS, such as the MPI Provider Network. N.J.A.C. 11:24B-5.2, captioned "general provisions," imposes binding state-law requirements for all ODS "provider agreements" -- such as for MPI's "provider agreement" with ECAPS. Significantly, N.J.A.C. 11:24B-5.2(c)(2) directs that "No provider agreement form shall contain. . . (2) A provision that establishes a unilateral right of the ODS, acting in its own accord, or at the request of a carrier, to amend the contract" and, pursuant to N.J.A.C. 11:24B-5.2(c)(2)(i), the only situation in which MPI could ever purport to impose a "unilateral amendment" would be in the limited context when "the amendment is required by State or Federal law." In addition, N.J.A.C. 11:24B-5.2(a)(1) directs that any provision in an ODS "provider agreement" that "conflict(s) with State or Federal law are effectively amended to confirm with the requirements of the State or Federal law."

78. During 2018, MPI, on behalf of itself and Cigna Payor, purported to unilaterally modify and amend the MPI Contract so as to reduce the Contract Rate due ECAPS from 85% of

[7] *See* https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (page 1).

ECAPS's billed charges to 75% of ECAPS's billed charges. *See* MPI's January 2018 letter included in Exhibit 1 to this Complaint. However, the state-law regulatory requirements set forth above prohibit such a unilateral modification or amendment of the MPI Contract, rendering the purported modification invalid.

79. Second, and even if these specific state-law regulatory requirements did not exist, section 9.3 in the MPI Contract states that "This Agreement shall be construed and governed in accordance with Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder." New Jersey common law has long prohibited a contracting party, in any type of contractual relationship, from purporting to unilaterally modify or amend a contract to the disadvantage of the other contracting party unless, among other common law requirements, the contracting party purporting to unilaterally modify or amend the contract proves that it has delivered new and additional consideration to the disadvantaged contracting party.

80. MPI, whether on behalf of itself or Cigna Payor, never delivered any new and additional consideration to ECAPS in connection with MPI's January 2018 letter purporting to unilaterally modify and amend the MPI Contract so as to reduce Cigna Payor's obligation to pay the 85% Contract Rate to an obligation to pay a Contract Rate of 75% of ECAPS's billed charges. As a result, state common law requirements also independently prohibit such a unilateral modification or amendment of the MPI Contract, rendering the purported modification invalid.

81. Section 5.3(c) in the MPI Contract states that "Any disputes that may arise under this Agreement related to the payment of a claim by Client or User" (such as Cigna Payor) "shall be referred directly to the respective Client or User for resolution." Prior to this action, ECAPS

made extensive good-faith efforts to resolve its disputes with Cigna Payor but those efforts were to no avail.

82. Section 8.1(a) in the MPI Contract states that in the event that ECAPS "cannot resolve a dispute with a Client as specified in Section 5.3," then ECAPS is authorized to "call MPI's service operations department." Before filing this action, ECAPS' representative also called MPI as provided in this section of the MPI Contract.

### C. <u>ECAPS' Performance Under the MPI Contract</u>

83. At all relevant times, ECAPS performed its material obligations under the MPI Contract, such as by fulfilling its contractual duty to provide its specialized breast cancer reconstruction services to all patients that are members of Cigna Payor Plans.

84. At all relevant times, and in compliance with its contractual duties under the MPI Contract, ECAPS also rendered its medically necessary post-mastectomy breast reconstruction services to Participants at a level determined in its sole medical judgment, and ECAPS did not discriminate or differentiate against Participants, but treated them under the same standards of care it applies to all its patients.

85. Since May 2012 and continuing to date, ECAPS and its doctors have treated many patients that are members of Cigna Payor Plans.

86. Since May 2012 and continuing to date, and within 180 days after the date of service on which ECAPS delivers its healthcare services to patients that are members of Cigna-administered group health plans, ECAPS and its doctors have electronically submitted their claims for payment to Cigna Payor for their usual and customary market-based charges (the Billed Charges as defined in the MPI Contract) as required by the MPI Contract. ECAPS' claims were

detailed and contain all of the contractually required information for the Cigna Payor to process and pay the claims, and were delivered to the Cigna Payor through a federally regulated electronic data platform governed by the federal HIPAA statute.

87. In addition, ECAPS has billed or collected cost-sharing sums from its patients who are Participants in Cigna Payor Plans for the amount of co-payments, deductibles, and co-insurance (if any) that these patients may owe, where the Cigna Payor has properly identified and communicated to ECAPS such cost-sharing amounts.

88. In practice, however, the Cigna Payor EOBs that ECAPS received, which ECAPS had to rely on to determine Participant cost-sharing amounts, almost always failed to comply with the Cigna Payor's obligations under the MPI Contract and applicable regulations. Instead, Cigna Payor EOBs contained a variety of false cost-sharing information, such as (a) assertions that a purported "discount" had been applied by Cigna Payor that resulted in no cost-sharing sum being owed by a patient, and (b) use of a legally impermissible "out-of-network" cost-sharing standard to a patient in situations where the law requires the Cigna Payor EOB to apply a lower "in-network" cost-sharing standard to a patient. And, typically, initial Cigna Payor EOBs were never subsequently updated, as legally required, with the Cigna Payor's issuance of a final EOB to ECAPS, once all claim-processing appeals were complete, identifying the information ECAPS needed to accurately bill or collect the cost-sharing amount from a patient.

89. As a result, to obtain proper and legally required cost-sharing information for its patients, ECAPS had to make repeated and time-consuming inquiries to Cigna Payor, year in and year out, and almost always without cooperation from the Cigna Payor. Cigna Payor simply refused to provide ECAPS with accurate cost-sharing information, or at times with any cost-

sharing information Nonetheless, where ECAPS was able, through its independent efforts, to ascertain accurate cost-sharing amounts, ECAPS proceeded to bill or collect those amounts from patients.

90. As explained above, the MPI Contract prohibits ECAPS from billing or collecting any amounts from its patients other than co-Payments, Deductibles, and Co-insurance (if any) required by the patient's Plan. *See also* MPI Contract (Exhibit 1 hereto) ¶ 5.4(c). Thus, for example, the MPI Contract prohibits ECAPS from billing or collecting any "balance amounts" from its patients for any portion of the difference between (a) the amount of ECAPS's billed charges to the Cigna Payor and (b) the amount that the Cigna Payor paid to ECAPS in response to its billed charges (whether at the 85% Contract Rate or some lesser amount). This practice, known as "balance billing," is not only expressly prohibited by the MPI Contract, *see id*., but also, as described below, by the federal No Suprises Act, which prohibits OON providers such as ECAPS from engaging in balance billing. In addition, the No Surprises Act prohibits Plan fiduciaries like Cigna Payor from demanding that OON providers like ECAPS engage in balance billing of patients as a condition to receiving payment for medical services provided to Plan Participants.

91. ECAPS has also complied with its other obligations under the MPI Contract, including relating to the maintenance of records and practice information (¶¶ 3.6, 3.14), required notices, if any (¶ 3.8), and maintenance of liability insurance (¶¶ 6.1., 6.2), for example.

### D. <u>Cigna Payor's Course Of Payments To ECAPS And Breach Of Its Obligations Under The MPI Contract</u>

92. As set forth above, pursuant to the MPI Contract, Cigna Payor is obligated to pay a Contract Rate of 85% of ECAPS's billed charges in return for ECAPS's obligation to deliver its specialized healthcare services to patients that are members of Cigna-administered Plans.

93. The Cigna Payor has issued EOBs to ECAPS each and every year since the MPI Contract became effective in May 2012, identifying MPI as the source through which a payment (or a payment-calculation) is being made by the Cigna Payor to ECAPS.

94. During each year since 2012, the Cigna Payor has made some payments to ECAPS that do satisfy its obligation to pay a Contract Rate of 85% of ECAPS's Billed Charges. However, for the overwhelming majority of ECAPS claims over the years, the Cigna Payor has unilaterally and unlawfully paid ECAPS less—typically far less—than the 85% Contract Rate due ECAPS under the MPI Contract.

95. During the period from January 2019 until September 2024, Cigna Payor has underpaid ECAPS' contractually owed charges (at the 85% Contract Rate) by an aggregate principal sum of several hundred million dollars. During those years, Cigna Payor paid between 1.8% and 15.5% of the amounts Cigna Payor, as Client or User, was contractually bound to pay ECAPS for providing medical services to Cigna Participants. From 2019 through September 2024, Cigna Payor paid ECAPS a small (and declining) fraction of the 85% Contract Rate contractually due ECAPS: in 2019 Cigna Payor paid ECAPS less than 8% of what it was owed; in 2020 less than 7%, in 2021 7.4%, in 2022 3%, in 2023 2.5%, and in 2024 through September, 1.8%.

96. During these years, ECAPS filed numerous appeals with Cigna Payor in an effort to obtain the payments to which ECAPS is entitled under the MPI Contract. In the course of pursuing those appeals, ECAPS learned that many of Cigna Payor's gross underpayments were the result of Cigna Payor intentionally applying false, improper, and legally unauthorized "discounts" to ECAPS' claims for treatment provided to Cigna Participants. For instance, Cigna Payor's coding usage revealed that it was purporting to justify the significantly reduced payments,

or non-payment altogether in many cases, by applying code "CO-45," a code reflecting a payment reduction due to a billed amount exceeding the plan-contracted amount.

97. As explained above, however, ECAPS is an OON provider that has no In-Network Provider Agreement or other direct contract with any patient's Plan. Rather, as Cigna Payor knew, it is the MPI Contract (not a separate and distinct Plan-Contract) that governs Cigna Payor's payment obligations to ECAPS for healthcare services delivered to members of Cigna-administered plans. As shown above, under that MPI Contract, Cigna Payor was required to pay ECAPS healthcare service claims at 85% of ECAPS customary charges.

98. As noted above, Cigna's EOBs over the years have identified MPI as the source through which Cigna Payor makes a payment to ECAPS. Yet, those same Cigna EOBs also adopt a position that, in effect, payment to ECAPS is to be governed by the reimbursement policies set by each patient's group health plan.

99. As shown by the detailed analysis of the MPI Contract set forth above, the MPI Contract contains no provision that obligates ECAPS to forego its right to receive a Contract Rate of 85% for its market-based, Billed Charges whenever a patient's Plan specifies that the provider is to be paid at a far lower in-network rate. Rather, as explained above, it was Cigna Payor that was "subject to the terms of" *the MPI Contract* if Cigna Payor offered Cigna Participants access to ECAPS' healthcare services via MPI's independent, preferred healthcare provider Network. MPI Contract ¶ 4.3.

100. The whole point of MPI creating its own independent healthcare provider "Network" of "Network Providers" was to allow Cigna Payor, through MPI, to furnish Cigna Participants with access to *authorized healthcare services from PPO network providers like*

*ECAPS that would not otherwise exist.* If ECAPS was already governed by an In-Network Provider Agreement with Cigna Payor, there would have been no practical need for MPI to provide Cigna Payor with access to ECAPS as an OON provider and member of the MPI Network. Indeed, if ECAPS was already bound to provide healthcare services to Cigna Participants as an in-network provider, why would Cigna enter into a contract with MPI to obtain access to the MPI Network, through which members of Cigna-administered plans could access ECAPS' specialized medical services? And why would MPI promise, in the MPI Contract, to "require Clients and its Users [*i.e.*, Cigna Payor] to use the Contract Rate [85%] agreed to in this Agreement" if ECAPS was already governed by an In-Network Provider Agreement with a Cigna Payor Plan, with its heavily discounted non-market rates?

101. The upshot of Cigna's scheme is to try and force ECAPS—an indisputably out-of-network provider with a right, under the MPI Contract, to be paid by Cigna Payor 85% of its customary rates—to relinquish its contract rights and, instead, accede to the *much lower*, *below-market* rates applicable to in-network providers under an In-Network Provider Agreement.

102. Cigna Payor's scheme reached its apotheosis in its April 14, 2023 letter to ECAPS announcing that the Cigna Payor would no longer pay anything ($0) to ECAPS in return for its delivery of specialized breast cancer reconstruction services to members of Cigna Payor Plans. As set forth below, Cigna Payor's pretext for discontinuing all payments to ECAPS is that ECAPS allegedly is not complying with certain Plan terms, even though Cigna Payor knows that ECAPS is not a party to or bound by any Plan-Contract it administers, and indeed has never directly contracted with any patient's Plan.

### E. Cigna Payor's April 14, 2023 Letter Disavowing Its Payment Obligations To ECAPS

103. On April 14, 2023, Cigna Payor sent a letter (the "Payment Disavowal Letter") informing ECAPS that, effective immediately, Cigna Payor would deny payment, in its entirety, to ECAPS for the full amount of all ECAPS claims for delivering its breast cancer reconstruction services to patients in Cigna-administered plans--unless ECAPS, as a condition precedent to obtaining a withheld payment from Cigna Payor, acceded to and complied with patient-collection conditions contained in Cigna Payor Plans.

104. The Payment Disavowal Letter provides a master class in the use of lies and gaslighting to create a false narrative, which in this case was intended to bully ECAPS into accepting Cigna Payor's knowingly false contention that ECAPs is bound by the terms of group health plan contracts between employers and their employees—even though ECAPS is not a party to any such Plan-Contracts and even though ECAPS has never directly contracted with any patient's group health plan . A true copy of Cigna Payor's Payment Disavowal Letter is attached hereto as Exhibit 2.

105. The Payment Disavowal Letter claims that Cigna Payor had reviewed records for selected ECAPS patients and purportedly "found" that "ECAPS does not consistently" bill to and collect from "Cigna customers" the "full" amount of their patient "responsibility" to make payments for both (a) cost-sharing amounts and (b) balance-billing amounts. Exh. 2, at 1. Here, Cigna Payor expressly recognizes that ECAPS is an OON provider, rather than an in-network provider that had directly contracted with a Cigna-administered Plan.

106. Cigna Payor's demand that ECAPS bill to and collect from "Cigna customers" the "full" amount of their patient "responsibility" to pay balance billing amounts (i.e., the difference

between the amount billed by ECAPS and any lesser amount paid by a plan) squarely violates (a) the contractual prohibition against balance billing a patient set forth in the MPI Contract, and (b) effective January 1, 2022, the statutory prohibition against balance billing a patient under the federal No Surprises Act.

107. Despite acknowledging that ECAPS was an OON provider to Cigna-administered Plans, and that ECAPS therefore is not a party to or bound by the Cigna Payor Plans' payment conditions, Cigna Payor nevertheless went on to state that "waiving, negotiating, or reducing any portion of a customer's cost share obligation and/or balance amount – a practice known as 'fee forgiveness' – is a violation of *the terms of our Cigna customer benefit plan agreement* and renders your charges not covered." Exh. 2, at 1 (emphasis added).

108. In other words, in the Payment Disavowal Letter, Cigna Payor unilaterally decreed that ECAPS's unwillingness to violate the balance billing prohibition in the MPI Contract and the statutory bar on balancing billing in the No Surprises Act constituted a legal basis for Cigna Payor, as a plan-fiduciary, (a) to deem ECAPS' services to patients as not covered under Cigna-administered Plans and (b) to make no payment ($0) for ECAPS' breast cancer reconstruction services to patients.[8] Without citation to any factual or legal authority, the Payment Disavowal Letter baldly asserts: "Please note that all health care professionals, including those who are non-participating, must abide by the terms of our benefit plans when seeking reimbursement from Cigna." *Id*. at 2.

[8] As set forth below, in the Payment Disavowal Letter, Cigna Payor also ignores and violates other provisions of the No Surprises Act that prohibit Cigna Payor from "conditioning" a plan payment to an out-of-network provider like ECAPS on its prior collection of a cost-sharing sum from a patient. Indeed, the No Surprises Act expressly directs Cigna Payor to deduct the patient cost-share from the out-of-network rate payment that Cigna Payor is statutorily mandated to pay directly to an out-of-network provider like ECAPS within 30 days after electronic claim submission to Cigna Payor.

109. Cigna Payor knew that as a legal matter the assertion was untrue. Yet this knowingly false statement was the *sine qua non* of Cigna Payor's blockbuster announcement that "we will deny your claims until you can establish proof of payment by your patient to our satisfaction" for both cost-sharing amounts and balance billing amounts. *Id*.

110. As explained in detail above, while ECAPS has an independent obligation under the MPI Contract to "bill or collect" patient cost-sharing amounts—and ECAPS did so when the Cigna Payor complied with its contractual obligation to provide ECAPS with the legally required information, needed to calculate the patient's cost-share, in final EOB's after the completion of claims-processing appeals—Cigna Payor's obligation to make payment to ECAPS for rendering medical services to Cigna Participants under the MPI Contract was not conditioned upon a patient first paying her cost-sharing amount. Cigna Payor's argument that it had the right to withhold payments for ECAPS' services until ECAPS obtained payment from the Cigna Participant is based on a purported contract to which ECAPS is not a party (a group health plan contract between an employer and its employees)—not the actual contract that governed Cigna Payor's payment obligations to ECAPS (the MPI Contract).

111. In correspondence responding to the Payment Disavowal Letter, ECAPS vigorously disputed Cigna Payor's contention that ECAPS had not been collecting required cost-sharing amounts from patients in the legally required manner, and pointed out that Cigna Payor's demands for collection of balance billing amounts from patients violated contractual and statutory requirements. As to cost-sharing, ECAPS' correspondence also pointed out, among other things, that in some cases Cigna Payor's own EOBs showed that the patient had no required co-payment or other obligation under the patient's Cigna Payor Plan.

112. In the wake of the Payment Disavowal Letter, ECAPS continued to provide medical treatment to Cigna Plan Participants in accordance with its obligations under the MPI Contract, and ECAPS continued to submit claims to Cigna Payor as provided in that contract. After April 14, 2023, however, Cigna Payor refused to make payment to ECAPS for its treatment of Cigna patients, rendering it in continuous breach of the MPI Contract (and, as set forth below, also in continuous violation of federal statutes). Cigna Payor's EOBs after April 14, 2023, falsely informed Cigna subscribers that they had purportedly received a 100% "discount" on ECAPS services and that no cost-share sum was owed.

113. Also in the wake of the Payment Disavowal Letter, MPI did nothing to "require Cigna Payor [as one of MPI's "Clients and its Users"] to use the Contract Rates agreed to in this Agreement," MPI Contract ¶ 4.7, rendering MPI also in breach of the MPI Agreement.

**COUNT I**

**(DECLARATORY JUDGMENT ASSERTED BY PLAINTIFF ECAPS AGAINST ALL DEFENDANTS)**

114. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

115. At all relevant times, the MPI Contract required Cigna Payor, as a "Client" or "User" under the MPI Contract, to pay ECAPS the 85% Contract Rate in exchange for ECAPS' provision of out-of-network breast reconstruction services to Cigna Payor Plan Participants.

116. Consistent with the MPI Contract, ECAPS submitted Clean Claims to Cigna Payor demonstrating that it had performed breast reconstruction services for patients covered by Cigna Payor Plans, and that it was therefore entitled to be paid by Cigna Payor for its services at the Contact Rate.

117. In response to some claims submitted by ECAPS, Cigna Payor paid ECAPS at the Contract Rate for breast reconstruction services provided to Cigna Payor Plan Participants.

118. However, for the overwhelming majority of claims, Cigna Payor refused to pay ECAPS at the Contract Rate. Instead, Cigna Payor paid ECAPS a small fraction of the contractually established amounts due ECAPS under the MPI Contract, or nothing at all, in breach of its obligations under the MPI Contract.

119. More specifically, rather than paying ECAPS at the Contract Rate, Cigna Payor often paid ECAPS at rates set by the patient's Plan, even though Cigna Payor knew that ECAPS was an out-of-network provider and thus was not a party to, or bound by, the patient's Plan or any other direct contract with Cigna Payor. In other cases, Cigna Payor refused to pay ECAPS anything at all, on the rationale that under the patient's Plan, Cigna Payor did not owe any payment. In both cases, *i.e.*, whether Cigna Payor made payment at in-network rates or failed to make any payment at all, Cigna Payor was relying on its position that ECAPS was bound by the terms of its patients' Cigna Payor Plans.

120. When ECAPS disputed the levels of payment as breaches of Cigna Payor's obligations under the MPI Contract, in the overwhelming majority of cases Cigna Payor did not acknowledge that ECAPS was entitled to be paid at the Contract Rate. Rather, Cigna Payor sought to resolve the dispute by either adhering to its original determination on the payment amount due or increasing the payment amount by a small fraction of what ECAPS was owed.

121. Cigna Payor expressly stated in the Payment Disavowal Letter its position that ECAPS is bound by Cigna Payor Plans even though in the same letter Cigna Payor acknowledged that ECAPS is an out-of-network provider.

122. MPI, Cigna Payor's agent for purposes of the MPI Contract, also took the position, in its January 2018 letter, that ECAPS was bound, via the MPI contract, to Cigna Payor reimbursement levels set in patient Plans to which ECAPS was not a party, even though the same letter acknowledged the applicability of the Contract Rate, which the letter purported to reduce from 85% to 75%. As shown in detail above, contrary to the assertion in the MPI January 2018 letter, the MPI Contract does not say that the Client or User's agreement to pay ECAPS for its services as the Contract Rate is subject to a patient Plan to which ECAPS is not a party.

123. Accordingly, there is an actual controversy among plaintiff ECAPS and defendants Cigna Payor and MPI, namely: ECAPS submits that under the MPI Contract it is entitled to be paid at the Contract Rate for providing its breast reconstruction services to patients who are members of a Cigna Payor Plan. By contrast, Defendants take the position that the payment owed to ECAPS for providing its breast reconstruction services to patients who are members of a Cigna Payor Plan is determined by applying the payment and reimbursement terms contained in patient Plans to which ECAPS, as an out-of-network provider, is not a party.

124. In taking the position that ECAPS is entitled to be paid not at the Contract Rate but only at reimbursement levels set in patient Plans to which ECAPS is not a party, and paying ECAPS at those levels rather than at the Contract Rate, Cigna Payor has committed hundreds (at a minimum) of breaches of its obligations under the MPI Contract, causing the loss to ECAPS of hundreds of millions of dollars over a period of years. As evidenced in its January 2018 letter to ECAPS, MPI has taken the same position as Cigna Payor, which has resulted in breach of MPI's independent obligations under the MPI Contract, as detailed above and further below.

125. Accordingly, ECAPS is entitled to a declaration, under 28 U.S.C. § 2201, that (i) the payment owed to ECAPS in exchange for providing its breast reconstruction services to patients who are members of a Cigna Payor Plan is the Contract Rate specified in the MPI Contract, not the rate of payment set in the patient's Cigna Payor Plan or any In-Network Provider Agreement, that (ii) in paying ECAPS for breast reconstruction services provided to patients who are Participants in a Cigna Payor Plan based on payment terms and rates set in Cigna Payor Plans rather than at the Contract Rate specified in the MPI Contract, Cigna Payor breached its obligations under the MPI Contract; and that (iii) in failing to require Cigna Payor, as a Client and/or User under the MPI Contract, to use the Contract Rates the parties agreed to in the MPI Contract, a breach reflected in the January 15, 2018 letter, through which MPI joined forces with Cigna Payor to bully ECAPS into accepting the much lower payment rates set in Cigna Payor Plans to which ECAPS was not a party, MPI breached its obligations under the MPI Contract.

**COUNT II**

**(BREACH OF CONTRACT ASSERTED BY ECAPS AGAINST CIGNA PAYOR)**

126. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

127. As set forth in detail above, at all relevant times a valid contract existed between ECAPS and MPI, namely, the MPI Contract as defined above. The contract specified, among other things, that ECAPS was required to provide its medical services to patients covered by a Plan administered or insured by a Client or User, as defined in the MPI Contract. In exchange, the Client or User (not MPI) was required to pay ECAPS for the medical services it provided at the Contract Rate specified in the MPI Contract.

128. Cigna Payor is a Client and/or User within the meaning of the MPI Contract, as explained in detail above.

129. In contracting with ECAPS to provide medical services to Cigna Payor Plan members in exchange for payment by Cigna Payor, MPI was acting as the agent of a disclosed principal, namely, Cigna Payor.

130. In addition, or in the alternative, the MPI Contract and MPI's related contract with Cigna Payor referenced in paragraph 4.3 of the MPI Contract (the "MPI-Cigna Payor Contract"), which, as described in the MPI Contract affords Cigna Payor the right to access the MPI Network, together form a unitary and interconnected contract, with the terms of each incorporated by reference into the other.

131. ECAPS materially performed its obligations under the MPI Contract, whether understood as a standalone contract or a unitary and interconnected contract incorporating the terms of the MPI-Cigna Payor Contract, including by providing its services to patients covered by Cigna Payor Plans and timely submitting Clean Claims to Cigna Payor.

132. Cigna Payor, under the express terms of the MPI Contract and as a disclosed principal under the MPI Contract, was obligated, as Client and/or User, to pay ECAPS at the Contract Rate within 30 business days of receiving a claim from ECAPS, or as otherwise provided by state or federal law governing timely payment of claims.

133. In hundreds (at a minimum) of instances, Cigna Payor breached its payment obligations under the MPI Contract, by failing to make payment to ECAPS at the Contract Rate for the medical services ECAPS rendered to patients covered by a Cigna Payor Plan. Rather, Cigna Payor paid ECAPS only a small fraction of the sums contractually due ECAPS or made no

payment at all. After the Payment Disavowal Letter, Cigna Payor more systematically ceased paying anything at all to ECAPS for treating members of Cigna Payor Plans.

134. Cigna Payor's hundreds (at a minimum) of breaches of its payment obligations for services rendered to ECAPS patients covered under Cigna Payor Plans caused ECAPS hundreds of millions of dollars in damages, at a minimum. As a disclosed principal under the MPI Contract, Cigna Payor is liable for all the damages its breaches caused ECAPS. In addition, or in the alternative, in light of the unitary and interconnected nature of the MPI Contract and the MPI-Cigna Payor Contract, is liable to ECAPS for the damages caused by Cigna Payor's breaches.

**COUNT III**

**(BREACH OF CONTRACT ASSERTED BY ECAPS AGAINST MPI)**

135. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

136. As set forth in detail above, at all relevant times a valid contract existed between ECAPS and MPI, namely, the MPI Contract as defined above. Among other things, in the MPI Contract MPI promised that "MPI will require Clients and its Users to use the Contract Rates agreed to in this Agreement" as the rate of payment for services rendered by ECAPS to patients covered by a Cigna Plan. MPI Contract ¶ 4.7.

137. ECAPS materially performed its obligations under the MPI Contract, including by providing its services to patients covered by Cigna Payor Plans and timely submitting Clean Claims to Cigna Payor.

138. In hundreds (at a minimum) of instances, MPI breached its obligation to require Cigna Payor, as a Client and/or User under the MPI Contract, to use the Contract Rates the parties

agreed to in the MPI Contract. Rather, as evidenced by MPI's January 15, 2018 letter, MPI willingly signed onto Cigna Payor's efforts to bully ECAPS into accepting payment for its services at the much lower payment rates set for in-network providers in Cigna Payor Plans, to which ECAPS was not a party as MPI and Cigna Payor knew and acknowledged. In so doing MPI breached its independent obligations under the MPI Contract.

139. MPI's hundreds (at a minimum) of breaches of its obligation to require Cigna Payor to use the Contract Rate in paying ECAPS for services rendered to ECAPS patients covered under Cigna Payor Plans caused ECAPS tens of millions of dollars in damages, at a minimum.

## COUNT IV

### (DECLARATORY JUDGMENT ASSERTED BY ECAPS AGAINST ALL DEFENDANTS)

140. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

141. By letter dated January 2018, MPI purported to unilaterally modify the MPI Contract, by stating that, beginning in 30 days, the Contract Rate in the MPI Contract would be reduced from 85% to 75%.

142. In purporting to unilaterally modify the MPI Contract, MPI invoked paragraph 9.2 of the MPI Agreement, which states that MPI may amend the MPI Contract by providing written notice to ECAP of at least thirty (30) days, and further states that the noticed modification will be effective unless ECAPS rejects the proposed amendment in writing within 15 days of receipt. Thus, the MPI Contract permits MPI to modify the MPI Contract (i) without ECAPS' consent and (ii) without providing any additional consideration in exchange for purported reduction of the Contract Rate from 85% to 75%.

143. For the reasons explained above, the purported unilateral modification was and is, therefore, ineffective.

144. There is an actual case or controversy among ECAPS on the one hand, which contends that MPI's January 2018 purported unilateral reduction of the Contract Rate was and is legally null and void, and Cigna Payor and MPI on the other hand, which contends that MPI's January 2018 purported unilateral modification was effective in reducing the Contract Rate due ECAPS under the MPI Contract from 85% to 75%.

145. Accordingly, ECAPS is entitled to a declaration, under 28 U.S.C. § 2201, declaring that (i) MPI's January 2018 purported unilateral reduction of the Contract Rate was and is legally null and void, and that (ii) the Contract Rate contained in the MPI Contract was never reduced to 75% and has always been, and remains through the present, 85% of ECAPS' Billed Charges as defined in the MPI Contract.

## COUNT V

### (BREACH OF CONTRACT ASSERTED BY ECAPS, AS THIRD-PARTY BENEFICIARY, AGAINST CIGNA PAYOR)

146. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

147. The MPI-Cigna Payor Contract, as referenced in paragraph 4.3 of the MPI Contract, provides Cigna Payor with a right of access to MPI's independent Network of OON providers, including ECAPS, which allows Cigna Participants to obtain healthcare services from OON providers like ECAPS, and have those services covered under the Participant's Cigna Payor Plan.

148. Upon information and belief, in exchange for obtaining the right to access the MPI Network, Cigna Payor agreed, in the MPI-Cigna Payor Contract, to pay ECAPS, as an OON

provider, under the terms of the MPI Contract and at the Contract Rate specified in the MPI Contract, namely 85% of ECAPS' Billed Charges as defined in the MPI Agreement.

149. In entering the MPI-Cigna Payor Contract, the contracting parties intended to benefit ECAPS by paying ECAPS for medical services it would render to Participants in Cigna-administered Plans. Indeed, without agreeing to pay ECAPS, Cigna Payor would not have obtained access to the MPI Network. Thus, Cigna Payor's agreement to pay ECAPS for its medical services was a central term of the MPI-Cigna Payor Contract. Accordingly, ECAPS is a third-party beneficiary of the MPI-Cigna Payor Contract.

150. In hundreds (at a minimum) of instances, Cigna Payor breached its obligations under the MPI-Cigna Payor Contract to make payment to ECAPS at the Contract Rate for the medical services ECAPS rendered to patients covered by a Cigna Payor Plan.

151. Cigna Payor's breaches of the MPI-Cigna Payor Contract caused ECAPS tens of millions of dollars in damages, at a minimum.

## COUNT VI

### (VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ASSERTED BY ECAPS AGAINST CIGNA PAYOR)

152. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

153. Connecticut statutes regulate aspects of the relationships between a PPO such as MPI, a Claims Administrator that accesses MPI's PPO Network such as the Cigna Payor, and a health care provider such as ECAPS.

154. In particular, Connecticut General Statutes § 42-491(c) states that "Each covered entity shall pay the health care provider's discounted rates or fees in accordance with the terms and conditions set forth in the contract between the contracting entity and such provider."

155. The applicable definitions define a "covered entity" as "any entity that has not contracted directly with a health care provider but that buys, leases, rents, is assigned or accesses a contract or terms of a contract with a health care provider, that is responsible for (A) the payment or coordination of health care services, or (B) the establishment or extension of health care provider networks." Connecticut General Statutes § 42-490(2).

156. The applicable definitions define "health care provider" as "any physician, physician group, physician network, independent practice association, physician organization or physician hospital organization." Connecticut General Statutes § 42-490(3).

157. The applicable definitions define "contracting entity" as "any entity that contracts directly with a health care provider (A) *for the delivery of health care services*, or (B) for the selling, leasing, renting, assigning or granting of access to a contract or terms of a contract. For the purposes of this section, a health care provider is not a contracting entity." (emphasis added).

158. Cigna Payor is a "covered entity" within the meaning of § 42-491(c) because it has not contracted directly with ECAPS, but accesses a contract or terms of a contract with ECAPS (*i.e.*, the MPI Contract) and is responsible for the payment or coordination of health care services.

159. ECAPS is a "health care provider" within the meaning of § 42-491(c),

160. MPI is a "contracting party" within the meaning of § 42-491(c), because it has contracted directly with ECAPS for the delivery of health care services to Participants in Cigna-administered group health plans.

161. Read together in light of the statutory definitions, Section 42-491(c) mandates that Cigna Payor "shall pay" ECAPS' discounted rates in accordance with the terms and conditions set forth in the MPI Contract, *i.e.*, that Cigna Payor "shall pay" ECAPS at the 85% Contract Rate specified in the MPI Contract.

162. Connecticut General Statutes § 42-494(a) states that "[a]ny violation of 42-491 shall be deemed an unfair or deceptive insurance practice under section 38a-816," which defines unfair and deceptive acts or practices in the business of insurance.

163. A private party may sue an entity responsible for carrying out an unfair or deceptive practice under the Connecticut Unfair Trade Practices Act (CUTPA) where there is an alleged violation of a statute regulating a specific type of insurance related conduct, in particular, where the insurance related conduct has been defined by the Legislature as unfair and deceptive *per se*.

164. Cigna Payor's longstanding and ongoing refusal to pay ECAPS at the contractually required 85% Contract Rate constitutes a per se unfair and deceptive practice under § 42-494, which has caused ECAPS the loss of hundreds of millions of dollars, for which Cigna Payor is liable to ECAPS under CUTPA.

## COUNT VII

**(DECLARATORY JUDGMENT ASSERTED BY PLAINTIFF ECAPS AGAINST THE CIGNA PAYOR: VIOLATION OF STATUTORY PAYMENT MANDATE UNDER FEDERAL NO SURPRISES ACT, 29 U.S.C. § 1185e)**

165. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

166. Pursuant to the Federal No Surprises Act ("NSA"), effective as of January 1, 2022, Congress amended ERISA. Some of the relevant statutory provisions in the NSA are codified at 29 U.S.C. § 1185e.

167. 29 U.S.C. § 1185e(b), part of the NSA, is captioned "Coverage of Non-Emergency Services Performed by Nonparticipating Providers at Certain Participating Facilities."

168. In 29 U.S.C. § 1185e(b)(1), Congress has (a) create various rights for a "nonparticipating provider" as against an ERISA-regulated "group health plan,"[9] and (b) imposed various obligations, duties, and requirements on the Cigna Payor, acting as a plan-fiduciary entrusted with discretionary control over making health care payments on behalf of an ERISA-regulated group health, to a nonparticipating provider such as ECAPS.

169. ECAPS is a "nonparticipating provider" within the meaning of 29 U.S.C. § 1185e(a)(3)(G)(i). This statute defines a "nonparticipating provider" to include a "health care provider" that "does not have a contractual relationship" with a group health "plan" for "furnishing" health care "service under the plan." A "nonparticipating provider" to a group health plan is also known as an "out-of-network provider" to a group health plan. As set forth above, ECAPS is an independent and out-of-network healthcare provider that has never entered into a direct contractual relationship with any patient's group health care plan.

170. 29 U.S.C. § 1185e(b)(1)(d) sets forth the NSA's statutory payment mandate that the Cigna Payor has persistently violated through its gross underpayments and non-payments to

[9] As noted above, an ERISA-regulated "group health plan" includes the Cigna Payor where, as in this case, the Cigna Payor is entrusted by a group health plan to exercise discretionary control, as a statutorily defined "plan fiduciary," over whether a group health plan will comply with its legal obligations.

ECAPS. The statute states that where, as in this case, a nonparticipating provider such as ECAPS delivers non-emergency health care "services" to a patient at a "participating facility" for which "any benefits are provided or covered by a group health plan," then the group health plan (for which the Cigna Payor, as a plan fiduciary, is acting here) "*shall pay*" a "total plan. . . payment directly" to such nonparticipating provider "equal to the amount by which the out-of-network rate" for such health care "services exceeds the cost-sharing amount imposed under the plan" (the "Statutory Payment Mandate") (emphasis added).[10]

171. 29 U.S.C. § 1185e(b)(2)(A)(i) defines a "participating health care facility" as a "health care facility described in clause ii" (such as a "hospital" or "ambulatory surgical center" as defined in 29 U.S.C. § 1185e(b)(2)(A)(ii)) that "has a direct or indirect contractual relationship" with a "plan" as to "the furnishing of" a health care "service at the facility." Since the NSA became effective on January 1, 2022, ECAPS has delivered all of its health care services (as a statutorily defined nonparticipating provider) to its patients at a statutorily defined "participating health care facility."

172. 29 U.S.C. § 1185e(a)(3)(K)(ii)(I) defines the "out-of-network rate" as equal to an "amount of payment" to which the nonparticipating provider and the plan "agree" and, in that event, the "out-of-network rate" is that "agreed on amount" between the nonparticipating provider

[10] 29 U.S.C. § 1185e(b)(1)(A) prohibits a group health plan (defined to include the Cigna Payor as a plan-fiduciary) from imposing a "cost-sharing requirement" on a patient "that is greater than the cost-sharing requirement that would apply under such plan" if the health care services had been furnished by an "in-network provider" under a direct contractual relationship with the plan. In other words, the patient cannot be charged a "cost-sharing" amount by the plan (or its plan-fiduciary like the Cigna Payor) that exceeds the in-network cost-sharing amount, even though the health care services were delivered to the patient by an out-of-network provider like ECAPS that lacks a direct contractual relationship with the plan.

and the plan. Here, as set forth above, the "agreed on amount" for the "out-of-network rate" that must be paid on behalf of a plan to ECAPS, as a statutorily-defined nonparticipating provider, is the "agreed on amount" in the MPI Contract, *i.e.*, the Contract Rate of 85% of ECAPS's Billed Charges. Since ECAPS delivers health care services in the States of New Jersey and New York, neither one of which has enacted a "specified state law" (as defined in 29 U.S.C. § 1185e(a)(3)(K)(i)) or an "all-payer model agreement" (as defined in 29 U.S.C. § 1185e(a)(3)(K)(iii)), the statutory definition for an "out-of-network rate" in 29 U.S.C. § 1185e(a)(3)(K)(ii)(I) is the "agreed on amount" in the MPI Contract.

173. 29 U.S.C. § 1185e(b)(1)(C) further mandates that the statutorily mandated payment shall be made on behalf of the Plan to a nonparticipating provider like ECAPS "not later than 30 calendar days after the bill for such items or services is transmitted by such provider."[11]

[11] In addition, as to the issue of a statutorily mandatory plan-payment to a nonparticipating provider like ECAPS within 30-days after claim submission to the plan, 29 U.S.C. § 1185e(b)(1)(D) also requires that a plan (or a plan-fiduciary) "shall pay" a total plan payment directly to a nonparticipating provider "in accordance, if applicable, with the timing requirement described in subsection (c)(6)." 29 U.S.C. § 1185e(c)(6), captioned "Timing of Payment," mandates that a "total plan or coverage payment" that is "required" to be made to a nonparticipating provider "pursuant to subsection (a)(1) or (b)(1)" [i.e., 29 U.S.C. § 1185e(b)(1)(d)] "for which a payment amount is determined under open negotiations under paragraph (1) [*i.e.*, 29 U.S.C. § 1185e(c)(1)] shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." Therefore, just as 29 U.S.C. § 1185e(b)(1)(c) mandates a direct plan-payment to a nonparticipating provider within 30-days of claim submission, 29 U.S.C. § 1185e(c)(1), captioned "Determination through open negotiation" - - as incorporated by reference into 29 U.S.C. § 1185e(b)(1)(D) and 29 U.S.C. § 1185e(c)(6) - - indicates that where a health care provider and a plan have engaged in an "open negotiation" that results in "an amount agreed on" for a "payment amount," then that "amount agreed on" shall constitute a type of "determination through open negotiation" that triggers the mandate that a plan "shall pay" that "amount agreed on" to a nonparticipating provider within 30 days after claim submission to the plan.

174. The Cigna Payor, acting as a plan fiduciary entrusted with discretionary control over making health care payments on behalf of ERISA-regulated group health plans, has violated the statutory rights Congress, through the NSA, has afforded ECAPS as an out-of-network provider, by mandating that those Cigna-administered plans (acting through the Cigna Payor as plan-fiduciary) "shall pay" an "out-of-network rate" for "the agreed on amount" to out-of-network provider ECAPS "directly" and within 30-days after claim submission to the Cigna Payor.

175. Since the NSA became effective on January 1, 2022, and continuing to date, the Cigna Payor, acting as a plan-fiduciary for Cigna-administered plans, (a) has never timely complied with the NSA's statutory mandate that such Cigna-administered plans "shall pay" an "out-of-network rate" for the "agreed on amount" to ECAPS "directly" and within 30-days after claim submission to the Cigna Payor; (b) in most cases, has paid nothing to ECAPS, despite ECAPS's delivery of health care services to patients covered under Cigna-administered plans; and (c) in other cases, has paid a very small fraction of the statutorily mandatory amount owed by Cigna-administered plans to out-of-network provider ECAPS.

176. The mandatory "shall pay" payment mandate created by Congress (the "Statutory Payment Mandate") may be enforced by an out-of-network provider such as ECAPS, for whose benefit the Statutory Payment Mandate was enacted.

177. For the reasons set forth in detail above, there is an actual controversy between ECAPS and the Cigna Payor relating to ECAPS' claims for payment for breast reconstruction services it provided to patients covered by a Cigna-administered Plan: ECAPS submits that, under the NSA, ECAPS is entitled to be paid the "agreed on amount" (as defined in the MPI Contract)

from the Cigna Payor within 30 days of electronic claim submission, while Cigna Payor has refused to pay either the "agreed on amount" or in many cases anything at all.

178. Accordingly, ECAPS is entitled to a declaration, pursuant to 28 U.S.C. § 2201, declaring as follows:

(a) ECAPS constitutes a "nonparticipating provider" under the NSA entitled to enforce the statutory rights afforded a nonparticipating provider under the NSA against Cigna Payor as a plan fiduciary;

(b) The Contract Rate of 85% of ECAPS' Billed Charges under the MPI Contract constitutes the "agreed on amount" under the NSA, for purposes of establishing the "out-of-network rate" under the NSA, to which ECAPS has a statutory right to payment under the NSA from Cigna on behalf of Cigna-administered group health plans;

(c) Pursuant to the NSA, the Cigna Payor, as a plan-fiduciary, is subject to, and has violated, the Statutory Payment Mandate, by failing to pay an "out-of-network rate" for the "agreed on amount" to out-of-network provider ECAPS, namely, the Contract Rate for 85% of ECAPS' Billed Charges under the MPI Contract, "directly" and within 30-days after electronic claim submission to the Cigna Payor;

(d) As a result of Cigna Payor's ongoing violations of the Statutory Payment Mandate, ECAPS is entitled to all necessary and proper relief, pursuant to 28 U.S.C. § 2202, including but not limited to equitable relief and monetary relief in an amount to be proven at trial.

## COUNT VIII

**(DECLARATORY JUDGMENT ASSERTED BY ECAPS AGAINST THE CIGNA PAYOR: INDEPENDENT DISPUTE RESOLUTION DETERMINATIONS UNDER THE FEDERAL NO SURPRISES ACT, 29 U.S.C. § 1185e)**

179. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

180. As set forth above, ECAPS has both a contractual right under the MPI Contract, as well as a statutory right under the NSA, to payment by the Cigna Payor of an

agreed upon rate of 85% of ECAPS' billed charges, in return for ECAPS' delivery of health care services to patients covered by Cigna-administered plans.

181. At all relevant times, the Cigna Payor has continuously refused to pay ECAPS the amount it is owed for providing out-of-network breast reconstruction services to patients covered by Cigna-administered plans. On the overwhelming majority of claims submitted by ECAPS, Cigna Payor paid either a small fraction of what it owned, or nothing at all. Beginning with the April 2023 Payment Disavowal Letter, Cigna stopped making any payment to ECAPS for the medical services ECAPS provided to Cigna Plan members.

182. The NSA includes a non-mandatory independent dispute resolution ("IDR") process. 29 U.S.C. § 1185e(c)(1)(A) states that to resolve an unpaid or underpaid claim, an out-of-network provider such as ECAPS "may" initiate negotiations with a Plan (including Plan fiduciaries such as Cigna). The parties have 30 days to negotiate an agreed payment for the provider's services. If an agreement is not reached, either party "may" initiate the formal IDR process within four days of the end of negotiations. See 29 U.S.C. § 1185e(c)(1)(B).

183. If a party invokes the formal IDR process the parties then participate in a baseball style arbitration in which both parties submit their proposed payment amount to the IDR entity (*i.e.*, the arbitrator) and the IDR entity chooses one of the amounts as the amount the Plan must pay the out-of-network provider. The Plan then has 30 days to make the payment. *See* U.S.C. § 1185e(c)(2), (5), (6).

184. In an effort to obtain payment on at least some of its claims in the face of gross underpayment or non-payment by the Cigna Payor, ECAPS invoked the IDR process for some of its claims and received IDR awards rendered by the IDR entity. In the aggregate to date, through

the IDR process ECAPS has obtained awards against the Cigna Payor exceeding $3 million. The amount of the IDR determination for a particular claim is not subject to judicial review. *See* U.S.C. § 1185e(c)(5)(E).

185. Notwithstanding the NSA's mandate that such IDR determinations be paid within 30 days, *see* 29 U.S.C. § 1185e(c)(6)), the Cigna Payor has failed and refused to pay any portion of the IDR determinations obtained by ECAPS.

186. There is an actual controversy between ECAPS and the Cigna Payor regarding their rights, duties, and obligations under the NSA, in that ECAPS submits that it is entitled to be paid the amounts determined, through the IDR process, that Cigna Payor owes ECAPS for the claims submitted to the IDR process, while Cigna Payor has refused to pay the IDR determinations. Accordingly, the Court should award declaratory relief by determining, pursuant to 28 U.S.C. § 2201, as follows:

(a) The Cigna Payor has violated mandatory obligation under the NSA to pay IDR determinations obtained by ECAPS within 30 days, by failing to pay any portion of those determinations;

(b) The Cigna Payor owes ECAPS the amounts determined through the IDR process to be owed by Cigna Payor to ECAPS, as reflected in IDR determinations issued by IDR entities, an amount to be proven at trial but that comes to at least $3 million;

(c) As a result of Cigna Payor's refusal to pay the IDR determinations obtained by ECAPS, ECAPS is entitled to all necessary and proper relief, pursuant to 28 U.S.C. § 2202, including but not limited to equitable relief and monetary relief in an amount to be proven at trial.

## COUNT IX

**(BREACH OF FIDUCIARY DUTY UNDER ERISA ASSERTED BY MARCELLA LIVOLSI AGAINST CIGNA PAYOR AS PLAN FIDUCIARY)**

187. Plaintiffs repeat and reallege the previous paragraphs as though fully set forth in this paragraph.

188. 29 U.S.C. § 1132(a)(3) provides that a beneficiary such as Ms. Livolsi may bring a civil action "to enjoin any act or practice which violates any provision of" ERISA "or the terms of any plan," or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of [ERISA] or the terms of the plan." A plan fiduciary such as the Cigna Payor is subject to suit under this provision.

189. 29 U.S.C. § 1104(a)(1)(A)(i) directs that a fiduciary such as the Cigna Payor "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries."

190. In 1998, Congress enacted the Womens Health and Cancer Rights Act (WHCRA) as a statutory amendment to ERISA codified at 29 U.S.C. § 1185b.

191. The WHCRA mandates that private employer health plans, acting through their plan-fiduciaries like the Cigna Payor, "shall provide. . . coverage for" plan members' breast reconstruction services from their "attending physician" whenever the plan provides coverage for the mastectomy portion of their breast cancer treatment. 29 U.S.C. § 1185b(a).

192. The WHCRA provides that the breast reconstruction services must be carried out "in a manner determined" by the "attending physician and the patient." 29 U.S.C. § 1185b(a).

193. The WHCRA does not limit a breast cancer patient's coverage and treatment rights to only (a) those health care providers that are in-network with an ERISA-regulated group health plan or (b) have entered into a direct contractual relationship with the plan. *See* 29 U.S.C. 1185b. Rather the WHCRA allows the patient to seek treatment from whoever she selects as her "attending physician," whether the physician is in-network or out-of-network. See 29 U.S.C. § 1185b.

194. The statutory text makes clear the patient has the right to select an out-of-network surgeon as her "attending physician." Under a subsection captioned "Prohibitions," the WHCRA prohibits an ERISA-regulated group health plan (and its plan-fiduciaries) from acting to "penalize or otherwise reduce or limit the reimbursement" of a breast cancer patient's "attending provider. 29 U.S.C. § 1185b(c)(2)). In addition, under the subsection captioned "Rule of Construction," the WHCRA explains that a group health plan retains the ability to "negotiat[e] the level and type of reimbursement with a provider for care provided in accordance with this section." See 29 U.S.C. § 1185b(d).

195. Unlike in-network providers who have previously negotiated agreements for "the level and type of reimbursement" directly with a health plan, out-of-network providers typically lack such direct contracts for "the level and type of reimbursement" with a health plan. Negotiation over the provider's reimbursement is only necessary with an out-of-network physician.

196. Thus, the purpose of these subsections is to protect a breast cancer patient's right to treatment from an out-of-network provider.

197. Plaintiff Marcella Livolsi is a plan participant under a Cigna-administered group health plan sponsored by her New York headquartered employer BrainPOP, LLC.

198. In response to a breast cancer diagnosis, Livolsi arranged for the mastectomy portion of her breast cancer treatment to be performed by an oncology surgeon that was an in-network provider to her Cigna-administered plan.

199. Livolsi's in-network mastectomy surgeon, however, works as part of a breast cancer treatment team with ECAPS, an out-of-network provider, for the delivery of its specialized breast cancer reconstruction services to patients. During a single surgical session, the in-network mastectomy surgeon works in tandem with the ECAPS out-of-network reconstruction surgeon, thereby avoiding the need for multiple surgical sessions and/or hospitalizations on multiple dates.

200. Livolsi's in-network mastectomy surgeon does not work as part of a surgical team with any in-network specialized breast cancer reconstruction surgeons.

201. Livolsi, with the assistance of her breast cancer doctors, applied for authorization from the Cigna Payor, acting on behalf of her Cigna-administered plan, to confirm that the Cigna Payor would pay the cost of breast reconstruction surgery in connection with her mastectomy, to be provided by an ECAPS surgeon as her chosen out-of-network attending physician, as mandated by the WHCRA.

202. The Cigna Payor unlawfully denied, and refused to provide, Livolsi with her statutorily mandated coverage and treatment rights under the WHCRA to receive breast cancer reconstruction services from out-of-network provider ECAPS.

203. In addition to being mandated by the WHCRA, the Livolsi Plan provided coverage for breast reconstruction services, as required by the WHCRA, because her Plan provided coverage for her medically necessary mastectomy.

204. Further, since Livolsi received health care treatment in the state of New Jersey from an in-network plan-provider for the mastectomy portion of her breast cancer surgery, New Jersey health care quality laws also apply to her breast cancer surgery under her Plan-Contract. Bulletin No. 13-10 issued May 3, 2013, by the New Jersey Department of Banking and Insurance, which interprets and applies the health care quality laws in the state of New Jersey, directs that (a) whenever a mastectomy surgeon, who is in-network to a plan, "practice[es] as part of a team which includes out-of-network reconstructive surgeons who could participate at the same surgical session in which the mastectomy is performed, thereby avoiding the need for the covered person to undergo a separate institutionalization and surgery for the breast reconstruction" and those out-of-network reconstructive surgeons are "associated with the team of in-network surgeons who perform the mastectomy," it is a violation of New Jersey's health care quality laws for the patient's plan to deny authorization or approval for the patient to receive breast cancer reconstruction treatment from the out-of-network reconstructive surgeon and (b) "plans must approve the use of out-of-network specialists" in such circumstances, and "[p]lans may not deny requests for the use of out-of-network providers who can provide services at the same surgery session if an in-network provider is not available to provide the services at the same surgery session because they [in-network breast reconstruction provider] do not work with the surgeon who performs the mastectomy." Therefore, Cigna's denial of authorization for Livolsi to use out-of-network breast reconstruction surgeon ECAPS, even though ECAPS works as a breast cancer surgical team with Livolsi's in-network mastectomy surgeon, violated this New Jersey health care quality law incorporated into Livolsi's plan-contract.

205. Despite the pursuit and exhaustion of several plan-appeals, the Cigna Payor declined to reverse its decision to deny Livolsi her statutorily mandated and contractually provided coverage and treatment rights under the WHCRA and her Cigna-administered plan, to receive breast cancer reconstruction services from out-of-network provider ECAPS.

206. Despite Cigna's violation of Ms. Livolsi's right to coverage of her breast reconstruction surgery and refusal to pay ECAPS, ECAPS provided the medically necessary breast reconstruction surgery treatment that Livolsi sought from ECAPS.

207. By denying Ms. Livolsi coverage for her post-mastectomy breast cancer reconstruction surgery in violation of the WHCRA and Ms. Livolsi's Plan-Contract, the Cigna Payor violated its fiduciary duty to carry out its fiduciary responsibilities "solely in the interest of the participants" and "for the exclusive purpose of" "providing benefits to" Ms. Livolsi as a plan participant. 29 U.S.C. § 1104(a)(1)(A)(i)

208. Due to the Cigna Payor's violations of Ms. Livolsi's coverage and treatment rights under the WHCRA and her employer Plan-Contract, Ms. Livolsi was forced to incur substantial out-of-pocket medical costs and to face personal liability for the costs of her treatment that the law and Livolsi's plan require the Cigna Payor to pay.

209. Ms. Livolsi is entitled to equitable relief to redress the harm caused her by the Cigna Payor's violations of the WHCRA and Ms. Livolsi's Plan-Contract, including but not limited to restitution in an amount that pays the costs of her breast reconstruction treatment wrongfully denied her by the Cigna Payor and restores her to the financial position she would have been in absent the Cigna Payor's violations; and injunctive relief that (a) prohibits the Cigna Payor from further violating the WHCRA or relevant provisions of her Plan-Contract, and (b) requires the

Cigna Payor to comply with the WHCRA and Livolsi's Plan-Contract in all matters relating to her breast cancer diagnosis and treatment.

## JURY DEMAND

210. Plaintiffs request a jury trial on all issues and/or counts that are determined to be eligible for a jury trial.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor against Defendants as follows:

A. On Count I, pursuant to 28 U.S.C. § 2201, a declaratory judgment in favor of ECAPS against all Defendants declaring that:

(i) The payment owed to ECAPS, in exchange for providing its breast reconstruction services to patients who are members of a Cigna Payor Plan, is the 85% Contract Rate specified in the MPI Contract, not a lower rate of payment contained in or derived from a patient's Cigna Payor Plan or any In-Network Provider Agreement;

B. On Count II, judgment in favor of ECAPS against Cigna Payor for compensatory damages in an amount to be determined at trial, but that is expected to exceed $300 million;

C. On Count III, judgment in favor of ECAPS against MPI for compensatory damages in an amount to be determined at trial;

D. On Count IV, pursuant to 28 U.S.C. § 2201, a declaratory judgment in favor of ECAPS against all Defendants declaring that:

(i) MPI's January 2018 purported unilateral reduction of the 85% Contract Rate was and is legally null and void;

(ii) The 85% Contract Rate contained in the MPI Contract was never reduced to 75% and the Contract Rate has always been, and remains through the present, 85% of ECAPS' Billed Charges as defined in the MPI Contract; and that

(iii) Pursuant to 28 U.S.C. § 2202, ECAPS is entitled to all necessary and proper relief to enforce and implement the declaratory judgment, including but not limited to appropriate equitable relief

E. On Count V, judgment in favor of ECAPS for compensatory damages in an amount to be determined at trial but that is expected to exceed $300 million;

F. On Count VI, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), judgment in favor of ECAPS against Cigna Payor awarding (1) compensatory damages, in an amount to be determined at trial, (2) punitive damages as authorized by CUTPA, and (3) attorneys' fees as authorized by CUTPA;

G. On Count VII, pursuant to Federal No Surprises Act (NSA) and 28 U.S.C.§ 2201, a declaratory judgment in favor of ECAPS against Cigna Payor declaring that:

(i) ECAPS constitutes a "nonparticipating provider" under the NSA entitled to enforce the statutory right to payment afforded a nonparticipating provider under the NSA against Cigna Payor as a plan fiduciary;

(ii) The 85% Contract Rate for ECAPS' Billed Charges as defined in the MPI Contract constitutes the "agreed on amount" under the NSA for purposes of establishing the "out-of-network rate" under the NSA, to which ECAPS has a statutory right to payment under the NSA from Cigna Payor (the "Statutory Payment Mandate");

(iii) Pursuant to the NSA, the Cigna Payor, as a plan fiduciary, has violated, the Statutory Payment Mandate by failing to pay an "out-of-network rate" for the "agreed on amount" to out-of-network provider ECAPS, namely, the 85% Contract Rate for ECAPS' Billed Charges as defined in the MPI Contract, "directly" and within 30-days after electronic claim submission to Cigna Payor; and

(iv) Pursuant to 28 U.S.C. § 2202, ECAPS is entitled to all necessary and proper relief to enforce and implement the declaratory judgment, including but not limited to monetary damages in an amount to be determined at trial and/or appropriate equitable relief.

H. On Count VIII, and pursuant to the NSA and 28 U.S.C.§ 2201, a declaratory judgment in favor of ECAPS against Cigna Payor declaring that:

(i) Cigna Payor has a legally enforceable obligation to pay all ECAPS claims that have previously resulted in an IDR Determination under the NSA, in which Cigna Payor was directed to make payment to ECAPS, but as to which no

payment has ever been made by Cigna Payor, in an aggregate amount to be determined at trial but that amounts to no less than $3 million; and

(ii) Pursuant to 28 U.S.C. § 2202, ECAPS is entitled to all necessary and proper relief to enforce and implement the declaratory judgment, including but not limited to monetary damages in an amount to be determined at trial and/or appropriate equitable relief;

I. On Count IX, for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3), injunctive relief and/or other equitable relief in favor of Livolsi against Cigna Payor, of a nature and in an amount to be determined at trial;

J. Pre and post-judgment interest as provided by law and/or by applicable contract;

K. Attorneys' fees and costs as provided by law; and

L. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 10, 2025

**LAW OFFICES OF MICHAEL B. WOLK, P.C.**

By: /s/ Michael B. Wolk___________
Michael B. Wolk
155 East 55th Street, Suite 300B
New York, New York 10022
Tel: (917) 238-0576
michael.wolk@wolkgroup.com

-and-

**SCHLAM STONE & DOLAN LLP**

By : /s/ Elizabeth Wolstein_________
Elizabeth Wolstein
Samuel L. Butt
26 Broadway
New York, New York 10004
Tel : (212) 344-5400
ewolstein@schlamstone.com
sbutt@schlamstone.com

*Attorneys for Plaintiffs East Coast Advanced Plastic Surgery, LLC and Marcella Livolsi*