# Exhibit 1

# MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

This Agreement, which is effective as of **May 15, 2012** (the "Effective Date"), is entered into by and between **MultiPlan, Inc.**, on behalf of itself and its subsidiaries ("MPI"), *and* **East Coast Advanced Plastic Surgery, LLC**, a partnership, professional service corporation, limited liability company or other legally constituted entity of licensed, registered, or certified health care professionals organized to provide health care services ("Group").

In consideration of the promises and the mutual covenants and undertakings set forth in this Agreement, receipt and sufficiency of which is hereby acknowledged, the parties have executed this Agreement through their duly authorized representatives.

| **East Coast Advanced Plastic Surgery, LLC:** | **MultiPlan, Inc.** (on behalf of itself and its subsidiaries): |
|---|---|
| Signature: [signature] | Signature: [signature] |
| Print Name: CYRUS LOGHMANEE, MD | Print Name: Michael J. Ferrante |
| Title: MD | Title: EVP, Chief of Operations |
| Date: 5/4/12 | Date: 5/29/12 |
| Tax I.D. #: 452574498 | |
| National Provider Identifier (NPI): 1023306172 | |

**I. DEFINITIONS.** For purposes of this Agreement:

1.1 Benefit Program Maximum means an instance in which the cumulative payment by a User has met or exceeded the annual or lifetime benefit maximum (e.g., dollar amount or service count) for a particular type of Covered Service rendered to a Participant in accordance with the terms of the Participant's Benefit Program.

1.2 Billed Charges means the fees for a specified health care service or treatment routinely charged by Group regardless of payment source.

1.3 Clean Claim means a completed HCFA 1500 (or successor form), as appropriate, or other standard billing format containing all information reasonably required by the Client for adjudication.

1.4 Client means an insurance company, employer health plan, Taft-Hartley Fund, or an organization that sponsors Program(s), administers Program(s) on behalf of a User or otherwise provides services to a User regarding such Programs.

1.5 Co-insurance means an amount that the Participant is responsible for paying in accordance with the terms of the Participant's Benefit Program other than a Co-payment or Deductible.

1.6 Contract Rates means the rates of reimbursement to Group for Covered Services, as set forth in Exhibit D. Additional Contract Rate terms, if any, are also set forth in Exhibit D.

1.7 Co-payment means an expressed dollar amount for a given Covered Service, which is required to be paid by the Participant typically at the time of service under the terms of the Participant's Benefit Program.

1.8 Covered Services means health care treatment and supplies rendered by a Network Provider and provided to a Participant for which a User is responsible for payment pursuant to the terms of a Program.

1.9 Deductible means the amount a Participant is required to pay in accordance with the Participant's Benefit Program before a claim for benefits by the Participant is eligible for reimbursement by a User.

1.10 Network means an arrangement of Network Providers created or maintained by MPI, or one of its subsidiaries, under which such Network Providers have agreed to accept certain Contract Rates for Covered Services provided to Participants.

1.11 Network Provider(s) means a licensed facility or licensed, registered, or certified health care professional that agrees to provide health care services to Participants and has been independently contracted for participation in the Network. Network Providers may be referred to in this Agreement and in the administrative handbook(s) individually as "Network Facility" and "Network Professional" respectively.

1.12 Participant means any individual and/or dependent eligible under a Client's Program that provides access to the Network.

1.13 Participating Professional means a licensed, registered, or certified health care professional (i) who is an employee, member or partner of, or has contracted with, Group; (ii) who MPI has determined, in its sole discretion, satisfies the applicable credentialing criteria; and (iii) is bound to provide Covered Services to Participants within the scope of his or her applicable license, registration, certification, and privileges, and pursuant to this Agreement.

1.14 Program. Unless otherwise specified, the term Benefit Program and *ValuePoint* Program shall be referred to collectively as "Program".

(a) Benefit Program means any contract, insurance policy, workers' compensation plan, auto medical plan, government program, health benefit plan or other plan or program under which Participants are eligible for benefits.

(b) *ValuePoint* Program or Discount Card Program means a non-insured business arrangement under which, in exchange for a fee or other consideration paid by Participant directly to Client, and upon presentation of an identification card bearing the *ValuePoint* logo or other MPI authorized name and/or logo, a Participant has the right to reimburse Network Providers directly at the Contract Rate as payment in full for health care services rendered.

1.15 User means any corporation, partnership, labor union, association, program, employer or any other entity responsible for the payment of Covered Services, entitled to access to the Contract Rate under this Agreement. Client may also be a User. For purposes of the *ValuePoint* Program or Discount Card Program, User shall mean an individual.

## II. TERM AND TERMINATION

2.1 Effective Date; Term. This Agreement will become effective on the Effective Date and will continue in effect for a period of one (1) year ("Initial Term"). Unless otherwise terminated as specified in this Agreement, this Agreement shall renew automatically for consecutive one (1) year terms ("Renewal Term") on each anniversary of the Effective Date ("Renewal Date").

2.2 Discretionary Termination. After the expiration of the Initial Term, this Agreement may be terminated in the sole discretion of either party, by the provision of written notice at least one hundred and eighty (180) days prior to the Renewal Date, such termination to be effective on the Renewal Date.

2.3 Termination for Material Breach.

(a) This Agreement may be terminated by MPI upon written notice to Group if (i) any action is taken which requires Group to provide MPI with notice under Section 3.8; (ii) in the sole discretion of MPI, Group or any Participating Professional fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s); or (iii) Group or any Participating Professional fails to comply with any applicable state and/or federal law related to the delivery of health care services.

(b) In the event that one party commits a material breach of this Agreement (the "Breaching Party") other than those specified in Section 2.3(a), this Agreement will terminate upon the provision of at least thirty (30) days written notice to the Breaching Party specifying the material breach. The Breaching Party may cure the breach within such thirty (30) day period, provided however, that failure to cure said breach will result in termination as of the date specified in the notice.

2.4 Network Participation Termination. Either party may terminate this Agreement as to any of the Networks in which Group participates by the provision of at least ninety (90) days prior written notice to the other party. Termination of a Network will not terminate this Agreement as to any other Networks in which Group participates.

2.5 Selection and Termination of Participating Professionals.

(a) MPI, in its sole discretion, will designate those health care professionals who satisfy the credentialing criteria of MPI as Participating Professionals. MPI reserves the right to re-credential any Participating Professional.

(b) MPI, in its sole discretion, may terminate any Participating Professional upon at least ninety (90) days written notice.

(c) In addition to the termination of a Participating Professional as specified in Section 2.5(b), MPI may terminate the participation of any Participating Professional under this Agreement upon written notice to the Participating Professional if Participating Professional (i) engages in any action that requires Group to provide notice to MPI under Section 3.8 with respect to such Participating Professional; (ii) fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s), in the sole discretion of MPI; (iii) ceases to be an employee, member, partner, or contractor of Group; (iv) fails to comply with any

applicable state and/or federal laws related to the delivery of health care services; or (v) fails to comply with any other terms of this Agreement.

(d) Group will provide at least ninety (90) days prior written notice to MPI in the event that any Participating Professional voluntarily disenrolls from the Group and/or from the Network.

(e) Participating Professional may appeal the termination of such Participating Professional by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.6 Appeal of Termination. Group may appeal the termination of this Agreement by MPI by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.7 Effect of Termination; Continuing Obligations.

(a) Upon the termination of this Agreement by either party for any reason, all rights and obligations hereunder shall cease, except (i) those rights and obligations provided in Article VII and Article VIII; and (ii) those rights, obligations, and liabilities incurred prior to the date of termination.

(b) Upon termination of this Agreement for any reason, termination of any Network in which Group participates, or the termination of an individual Participating Professional's status as a Participating Professional under the terms of this Agreement, Group and/or Participating Professional will:

(i) continue to provide health care services to Participants who are receiving treatment on the effective date of termination (1) until the course of treatment is completed; (2) for a period of ninety (90) days or through the current period of active treatment for those Participants undergoing active treatment for a chronic or acute medical condition, whichever time period is shorter; (3) throughout the second and third trimester of pregnancy and/or through postpartum care, if requested by the Participant; or (4) until Group or Participating Professional makes reasonable and medically appropriate arrangements to transfer the Participant to the care of another provider, making such transfer to a Network Provider whenever appropriate (except as specified in subsections (2) and (3) herein);

(ii) accept payment made pursuant to Article V, as payment in full, for Covered Services rendered in accordance with this Section; and

(iii) inform Participants seeking health care services that Group and/or Participating Professional is no longer a Network Provider.

## III. RIGHTS AND OBLIGATIONS OF GROUP

3.1 Binding Authority. Group represents that it has been granted the authority in writing to enter into this Agreement and to bind all Participating Professionals to the terms of this Agreement.

3.2 Provision of Health Care Services. Group and each Participating Professional will render medical and health care services in a manner which assures availability, adequacy, and continuity of care to Participants. Group and each Participating Professional will remain solely responsible for the quality of health care services provided by Group and each Participating Professional to Participants, and will ensure such services are rendered in accordance with generally accepted medical practice and professionally recognized standards. Nothing contained herein will grant MPI or Client the right to govern the level of care of a patient. Utilization management decisions will only affect reimbursement of Group for services rendered and will not limit the performance of the services of Group and each Participating Professional or affect professional judgment.

3.3 Non-Discrimination. Neither Group nor any Participating Professional will differentiate or discriminate against Participants in the provision of health care services, and will render such health care services to all Participants in the same manner, in accordance with the same standards, and with the same availability as offered to Group's or Participating Professional's other patients.

3.4 Access. Group and each Participating Professional will use reasonable efforts to accept all Participants for treatment in accordance with all terms and conditions of this Agreement. Group will ensure that medical and health care services are available to Participants 24 hours a day, 7 days a week. Group will provide at least ninety (90) days prior written notice to MPI whenever Group or any Participating Professional (i) closes or limits their respective practice; and (ii) re-opens or removes any limitation on a closed or limited practice.

3.5 Licenses, Certifications and Accreditations. Group and each Participating Professional: (i) possesses, and will maintain in good standing, all licenses, registrations, certifications, and accreditations required by law to render health care services in the state in which Covered Services are rendered; and (ii) will comply with any applicable local, state and/or federal laws or regulations related to the delivery of health care services.

3.6 Medical and Billing Records.

(a) Group will prepare and maintain, and cause each Participating Professional to prepare and maintain, as appropriate, pertinent medical and billing information and records for each Participant ("Medical and Billing Records") in accordance with generally accepted medical, accounting, and bookkeeping practices and will maintain such Medical and Billing Records for at least seven years following the furnishing of health care services to Participants.

(b) Subject to any applicable legal restrictions and upon request by MPI and/or Client, Group or Participating Professional will promptly provide copies of the Medical and Billing Records to MPI and/or Client, for those purposes which MPI and/or Client deem reasonably necessary, including without limitation, quality assurance, medical audit, credentialing or recredentialing, payment adjudication and processing.

(c) Group and each Participating Professional will comply with all state and federal laws and the requirements specified in the administrative handbook(s) pertaining to the confidentiality of Medical and Billing Records, and will keep confidential, and take all precautions to prevent the unauthorized disclosure of any and all Medical and Billing Records.

3.7 On-Site Review. Subject to any applicable legal restrictions, and upon at least ten (10) days prior written notice, Group will permit and arrange for MPI and/or Client to conduct an on-site review to validate compliance with the terms of this Agreement by Group and each Participating Professional. Such on-site reviews shall not unreasonably interfere with Group's business and will be conducted during normal business hours.

3.8 Notice of Actions. Group will send written notice to MPI within ten (10) days of the following actions against Group, Participating Professional, or any agent and/or employee thereof, even if such action is being appealed: (i) any active investigation by a governmental agency; (ii) any final legal action; (iii) any final action by a regulatory or accrediting entity; (iv) a reduction in, or cancellation of general and/or professional liability insurance; or (v) final action of insolvency. Any notice required pursuant to this Section will be provided in accordance with the notice requirements specified in Section 9.9 of this Agreement, except that the address and agent to receive notice shall be as follows: Credentialing Coordinator to the Medical Director, MultiPlan, Inc., 1100 Winter Street, Waltham MA 02451.

3.9 Network Participation and Requirements. MPI may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all Network(s). Group and each Participating Professional acknowledge that certain Programs offered by Clients accessing the Network (i) may not include a network option; or (ii) may cover Covered Services under the Participant's Program at an in-Network or out-of-Network benefit level. Group and each Participating Professional will comply with any Network specific requirements contained in Exhibit B and/or the administrative handbook(s).

3.10 Utilization Management. Group and each Participating Professional will participate in and observe the protocols of Client's utilization management program, to the extent such program is consistent with industry standards.

3.11 Administrative Handbook(s). Group and each Participating Professional will comply with the terms of the administrative handbook(s), including, without limitation, observing the protocols of the quality management and credentialing/recredentialing program(s). MPI may, in its sole discretion, modify the administrative handbook(s) from time to time and post such modifications to the MPI website. Group and each Participating Professional will periodically review the administrative handbook(s) on the MPI website for updates.

3.12 Open Communication. Neither Group nor any Participating Professional will be prohibited from, or penalized by Client and/or MPI for communicating with patients regarding the appropriate treatment alternatives available to the patient, regardless of benefit coverage limitations. In addition, neither Client nor MPI will penalize Group or any Participating Professional if Group or Participating Professional, in good faith, reports to state or federal authorities any act or practice by the Client and/or MPI that jeopardizes a patient's health or welfare.

3.13 Exchange of Provider Professional Data.

(a) Group will submit to MPI such information as MPI may reasonably request (i) to verify the credentials of each professional employee, member, partner, or contractor of Group applying for participation in the Network ("Applicant"), and re-credential each Participating Professional; (ii) for the purpose of complaint resolution; (iii) for the purpose of utilization management; and (iv) for provider listings.

(b) Subject to applicable state and federal laws governing the confidentiality of peer review proceedings, Group and each Applicant and Participating Professional hereby consent to MPI permitting the inspection by Clients, or independent credentialing or accreditation entities, and their respective officers, directors, employees, medical directors, agents and representatives, of the contents of their respective application, credentialing file, the credentialing decisions of MPI with respect to such Applicant or Participating Professional, and all documents that may be material to an evaluation of the qualifications and competence of the Applicant or Participating Professional.

(c) Group will indemnify and hold MPI and its respective directors, officers, agents, employees and representatives, harmless from any and all liability, loss, damage, claim or expense of any kind, including costs and reasonable attorneys' fees, which result from any act or omission by Group or any Participating Professional concerning its representations, duties, and obligations under this Section 3.13.

3.14 Maintenance of Practice Information.

(a) Group will provide to MPI each practice location and tax identification number utilized by Group and will promptly inform MPI of (i) any change in the ownership of Group; (ii) the addition of a professional employee, member, partner, or contractor to Group; (iii) the departure of any Participating Professional from the Group; (iv) the refusal of any Participating Professional to continue to be a Participating Professional; and (v) any change in practice locations, telephone numbers, billing address or tax identification number. Failure to provide each practice location and tax identification number may result in a delay or error in the payment of claims for Covered Services rendered to Participants.

(b) All sites at which Participating Professionals practice that are affiliated with Group shall be considered in-Network sites under this Agreement. If a Participating Professional also practices independently of the Group and has not contracted with MPI directly with respect to that independent site, services rendered by Participating Professional at that site shall be considered out-of-Network. Participating Professional shall use different tax identification numbers to distinguish between in-Network and out-of-Network sites.

3.15 Subcontracting. In the event that Group delegates or subcontracts any of its rights, duties or obligations under this Agreement, Group shall ensure that any such subcontracted arrangement will be subject to the terms of this Agreement, including but not limited to the credentialing requirements specified in this Agreement.

## IV. RIGHTS AND OBLIGATIONS OF MPI

4.1 Limitations. MPI's duties are limited to those specifically set forth herein. MPI does not determine benefits eligibility or availability for Participants and does not exercise any discretion or control as to Program assets, with respect to policy, payment, interpretation, practices, or procedures. MPI is not the administrator, insurer, underwriter, or guarantor of Programs, and MPI is not liable for the payment of services under Programs.

4.2 Licenses, Registrations, and Certifications. MPI will comply with all laws and regulations governing its performance under this Agreement, including, but not limited to, obtaining and maintaining in effect all applicable licenses, registrations, and certifications necessary for that purpose.

4.3 Client Agreements. MPI agrees that it has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rates, shall be subject to the terms of this Agreement.

4.4 Client Listing. MPI will post to the MPI website a list of the Clients that have purchased the Network ("Client Listing").

4.5 Identification. MPI will require Clients to furnish Participants with a means of identifying themselves to Group as covered under a Program with access to the Network, such as (i) an MPI authorized name and/or logo on an identification card; (ii) an MPI phone number identifier; (iii) written notification by Client of MPI affiliation at time of benefits verification; (iv) an MPI authorized name and/or logo on the Explanation of Benefits; or (v) other means acceptable to MPI and Group.

4.6 Direction. MPI will require Clients to provide a mechanism encouraging direction of Participants to Network Providers, including, but not limited to, the availability of Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers.

4.7 Use of Contract Rates. MPI will require Clients and its Users to use the Contract Rates agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network.

## V. PAYMENT AND BILLING

5.1 Submission of Claims. Group will submit claims for payment within ninety (90) days of furnishing health care services at Group's Billed Charges for such health care services. Claims received after this time period may be denied for payment by Client or User, and Group shall not bill Client, User, MPI or Participant for such denied claims. Group will follow the claims submission procedures contained in the administrative handbook(s). A Clean Claim shall be deemed to have been received by the Client: (i) on the date that such Clean Claim is transmitted to the Client if transmitted by electronic means; or (ii) five (5) calendar days following the deposit of such Clean Claim in the U.S. Mail, first class postage prepaid and addressed to the Client at such address set forth on the Participant's identification card. Upon request, Group shall furnish to Client or MPI, all information reasonably required to verify the health care services provided by Group and the charges for such services.

5.2 Payment for Covered Services.

(a) Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients subject to state or federal law with regard to timely payment of claims, Client shall pay or arrange for User to pay Group the Contract Rate for Covered Services per the requirements of such state or federal law, and shall be subject to any interest and/or penalties under such law.

(b) Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients that are not subject to the state or federal law with regard to timely payment of claims, Client will pay or arrange for User to pay Group the Contract Rate for Covered Services within thirty (30) business days of receipt of a Clean Claim and in accordance with the terms of this Agreement. In the event that a Clean Claim is not paid within thirty (30) business days from the date of receipt of such Clean Claim, Group has the right not to honor the Contract Rate. A Clean Claim shall be deemed to have been paid by the Client: (i) on the date that payment is transmitted to the Group if transmitted by electronic means; or (ii) on the date payment is deposited by Client or User in the U.S. Mail, first class and postage prepaid, addressed to Group.

(c) Any payments due by Client under this Agreement shall be reduced by any applicable Co-payments, Deductibles, and/or Co-insurance, if any, specified in the Participant's Benefit Program and/or any service for which the Participant's Benefit Program does not provide coverage. Payment by Client or User shall be subject to Exhibit D, the administrative handbook(s), and industry standard coding and bundling rules, if any.

5.3 Disputed Claims.

(a) Pre Payment Disputed Claims. Client shall have the right, within thirty (30) business days of Client's receipt of a claim and prior to payment of said claim, to provide Group with written notification that a claim is not a Clean Claim containing all complete and accurate information required for adjudication or if Client has some other stated dispute with the claim. Client shall pay or arrange for User to pay Group at the Contract Rate(s) for Covered Services for all portions of the claim not in dispute. Group shall provide the complete and accurate information requested within thirty (30) business days of Client's request, and Client shall pay or arrange for User to pay for Covered Services within thirty (30) business days of receipt of the additional and/or corrected information.

(b) Post Payment Disputed Claims. Group may challenge payment to Group within one hundred and eighty (180) days following Group's receipt of such payment from Client, otherwise such payment shall be deemed final.

(c) Claims Dispute Resolution; Client. Any disputes that may arise under this Agreement related to the payment of a claim by Client or User shall be referred directly to the respective Client or User for resolution.

5.4 Billing of Participants.

(a) Group will bill or collect from a Participant all Co-payments, if any, as specified in the Participant's Benefit Program for Covered Services. Following the receipt of an explanation of benefits form from Client, Group will bill or collect from a Participant: (i) the Deductible or Co-insurance, if any, as specified in the Participant's Benefit Program; (ii) payment for health care services or supplies at the Contract Rate once the Participant has reached the Benefit Program Maximum, if applicable, and/or (iii) payment for services, other than Covered Services, for which the Participant's Benefit Program does not provide coverage.

(b) *ValuePoint* Program Participants and Discount Card Program Participants shall be responsible for payment of the Contract Rates directly to Group.

(c) Except as specified in Sections 5.4(a) and (b), neither Group nor any Participating Professional will bill or require any Participant to tender any payment with respect to Covered Services. Furthermore, neither Group nor any Participating Professional will bill or collect from the Participant (i) the difference between the Contract Rate agreed to in this Agreement and the Group's Billed Charges, or (ii) for any amounts not paid to Group due to Group's failure to file a timely claim or appeal, or due to the application of claim coding and bundling rules.

5.5 Coordination of Benefits. Except as otherwise required by the Participant's Program, if Client is other than primary under the coordination of benefits rules, Group will accept from Client as payment in full for Covered Services, the amount of the Participant's out-of-pocket costs under the primary plan (i.e., Co-payment, Deductible, and/or Co-insurance, if any) to the extent applicable under the Participant's Program. Group will cooperate fully with MPI and/or Client in providing information related to proper coordination of benefits.

## VI. LIABILITY INSURANCE

6.1 Group Insurance. Group will maintain: (i) professional liability insurance at minimum levels of at least $1,000,000 per occurrence and $3,000,000 in the aggregate; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate. If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

6.2 Participating Professional Insurance. Group will maintain, or ensure that each Participating Professional maintains: (i) professional liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 in the aggregate for each individual Participating Professional; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate to cover each individual Participating Professional. If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

## VII. CONFIDENTIAL INFORMATION; TRADEMARKS; ADVERTISING AND PUBLICITY

7.1 Confidential Information. All information and materials provided by MPI or Client to Group or any Participating Professional will remain proprietary to MPI or Client respectively. Neither Group nor any Participating Professional will disclose any of such information or materials or use them except as may be required to carry out its respective obligations under this Agreement.

7.2 Trademarks, Advertising and Publicity. Except as set forth herein, MPI, Clients, and Group or Participating Professional will not use the other's name, symbols, trademarks, or service marks, presently existing or later established, in advertising or promotional materials or otherwise without their prior written consent and will cease any such usage immediately upon written notice or upon termination of this Agreement, whichever is sooner. MPI and/or Client may use the name of Group or Participating Professional as MPI and/or Client may deem reasonably necessary in carrying out the terms of this Agreement, including but not limited to, (i) the distribution of an announcement by MPI and/or Client to the media that Group or Participating Professional participates in the Network, and (ii) the creation and/or distribution of provider directories and other promotional materials.

## VIII. RESOLUTION OF DISPUTES BETWEEN THE PARTIES

8.1 Dispute Resolution. In the event that Group has a question or grievance regarding its rights or obligations under this Agreement or cannot resolve a dispute with a Client as specified in Section 5.3 herein, Group shall either:

(a) Call MPI's Service Operations Department, or

(b) Provide MPI with written notice specifying the nature of the dispute. Such notice to MPI shall be in writing and delivered by certified mail/return receipt requested, or by overnight delivery, to:

MultiPlan, Inc.
Service Operations Department
1100 Winter Street
Waltham, MA 02451

Within thirty (30) days of receipt of such notice, the parties will assign the appropriate level of management and staff members who will initiate discussions to seek resolution of the dispute, consistent with the terms of this Agreement. If the parties are unable to reach resolution within the initial thirty (30) day period, then designees of senior management from each party will have an additional thirty (30) days to resolve the dispute. This time period may be extended by mutual agreement of the parties. The parties, as mutually agreed, may include a mediator in such discussions. Neither party shall institute any legal action or proceeding until expiration of such agreed upon time periods.

## IX. GENERAL PROVISIONS

9.1 Entire Agreement; Captions. This Agreement, together with all Exhibits attached hereto, constitutes the entire agreement between Group and MPI, and will supersede any prior oral or written agreements between the parties. The

captions contained in this Agreement are for the convenience of the reader only, and will not be used in the interpretation of this Agreement.

9.2 Amendments. Group, Participating Professional, and MPI will comply with any and all of the amendments contained in Exhibit A. Unless otherwise required by this Agreement, this Agreement may be modified or amended as follows:

(a) upon at least thirty (30) days prior written notice from MPI to Group. Such amendment by MPI shall be effective as of the effective date specified in the notice ("Amendment Effective Date") unless Group gives written notice to MPI, within fifteen (15) days from the receipt of such notice, rejecting the proposed amendment. If Group rejects the proposed amendment, this Agreement will terminate on the Amendment Effective Date.

(b) upon written agreement executed by both parties.

9.3 Governing Law; Severability; Venue; Waiver. This Agreement shall be construed and governed in accordance with Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder. The finding by a court of competent jurisdiction that any provision herein is void shall not void any other valid provision of this Agreement. Venue of any dispute litigated between the parties shall be in Federal court in the state and county of residence of the defendant. Waiver of breach of any provision of this Agreement will not be deemed a waiver of any other breach of the same or a different provision.

9.4 Coordinating Provisions-State/Federal Laws and Accreditation Standards. This Agreement is subject to any requirements or prohibitions of relevant state and federal laws and regulations. Each party shall comply with all applicable state and federal statutes and regulations relating to this Agreement. In addition, Group, Participating Professional, and MPI will comply with the following information contained in Exhibit C: (i) coordinating provisions-State/Federal laws; (ii) national accreditation standards, including without limitation, the National Committee for Quality Assurance ("NCQA") and URAC; and/or (iii) geographic exceptions approved by MPI.

Amendment to contract *

9.5 Assignment. No assignment of this Agreement will be made by any party without the express written approval of the duly authorized representative of the other party; provided however, that:

(a) MPI may assign any or all of its rights and obligations hereunder, without prior written approval of Group, to an entity that directly or indirectly controls, or is controlled by, or is under common control with MPI.

(b) This Agreement may be automatically assigned without prior written approval of Group (and with no further action being required by either MPI or any of the individual Assignment Entities, as that term is defined herein) to one or more of the following individual entities: Central States, Southeast and Southwest Areas Health and Welfare Fund; and Connecticut General Life Insurance Company ("Assignment Entity/Entities"). Notwithstanding the issuance by MPI of one or more of such assignments to an Assignment Entity, MPI may retain its rights and obligations hereunder.

(i) In the event that MPI assigns this Agreement as specified in this Section 9.5(b), each of the Assignment Entities to which MPI issues an assignment will be deemed to hold independent, but identical contracts with Group. As to each Assignment Entity to which MPI issues an assignment, Group acknowledges and agrees that all references to the Network will be deemed references to that Assignment Entity's provider network.

(ii) Subsequent to any assignment of this Agreement to an Assignment Entity, Group may terminate such Assignment Entity's Agreement with Group by providing ninety (90) days prior written notice to the Assignment Entity.

9.6 Third Party Beneficiaries. Nothing contained in this Agreement will be construed to make MPI or Group, and their respective directors, officers, employees, agents, and representatives liable to persons or entities not parties hereto in situations in which they would not otherwise be subject to liability, except Clients, Users and Participants..

9.7 Independent Contractors. Each party, including its officers, directors, employees and agents, acts as an independent contractor. Neither party has express or implied authority to assume or create any obligation on behalf of the other. Each party solely is responsible for its own actions or omissions, and those of its officers, directors, employees and agents, arising in connection with obligations created under this Agreement, including the rendering of professional advice and/or treatment by Group or Participating Professional.

9.8 Precedence of Exhibits. In the event of any conflict between the terms and conditions specified in this Agreement, and the terms and conditions specified in the Exhibits to this Agreement, the following order of precedence will govern the applicable terms and conditions agreed upon by the parties: (i) Exhibit C (Coordinating Provisions-State/Federal Laws and Accreditation Standards); (ii) Exhibit A (Amendments); (iii) Exhibit B (Network Participation Requirements); and (iv) the base Agreement.

9.9 Notices. Unless otherwise specified in this Agreement, any notice required or permitted to be given pursuant to the terms and provisions of this Agreement will be in writing and must either be mailed (postage prepaid), facsimile, or e-mailed to the recipient at the address(es) listed below. Any notice under this Agreement shall be deemed to have been given when deposited in the mail, postage prepaid, if mailed or when receipt acknowledged, if faxed or e-mailed. The following address(es) or agent to receive notice may be changed by the provision of notice pursuant to this Section.

**To MPI:**
Attn: Office of the President & CEO
MultiPlan, Inc.
115 Fifth Avenue
New York, NY 10003-1004

**To Group:**
Attn: Cyrus Loghmanee, MD
East Coast Advanced Plastic Surgery, LLC
P.O. Box 442
Center Mooriches, NY 11934

With a copy to:
Attn: Regional Director
MultiPlan, Inc.
1100 Winter St.
Waltham, MA 02451

9.10 Force Majeure. Neither party will be liable for or be deemed to have breached any of its obligations under this Agreement (other than an obligation to pay money) if that party's failure to perform under the terms of this Agreement is due to any of the following: failure or delay in performance by the other party to this Agreement or anyone acting for or under such other party; any strikes, lockouts, acts of God or the elements, insurrection, riots, wars, natural disasters, fires, explosions, epidemics, quarantines, earthquakes, storms, floods, any shortages of energy, fuel, or any utility (e.g., electrical, natural gas, etc.) failure or disturbance however caused; any governmental action not the fault of the nonperforming party or similar condition or circumstance that is not caused by the nonperforming party.

9.11 Limitation of Damages. Neither party shall be liable for consequential, exemplary, or punitive damages. Any dispute between the parties is personal to the respective parties. Each party waives any right to bring a claim in any forum as a class action and agrees that it shall voluntarily serve as a class representative or member in litigation or arbitration adverse to the other.

# EXHIBIT A
# AMENDMENTS TO THE MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

The terms and conditions specified in the MPI Participating Professional Group Agreement are further subject to the amendments set forth herein:

1. Delete Section 1.8, Covered Services, in its entirety and replace it with the following:

   1.8 Covered Services means medically necessary health care treatment and supplies rendered by a Network Provider and provided to a Participant for which a User is responsible for payment pursuant to the terms of a Program.

2. Delete Section 1.14, Program, in its entirety and replace it with the following:

   1.14 Program. Unless otherwise specified, the term Benefit Program and *ValuePoint* Program shall be referred to collectively as "Program".

   (a) Benefit Program means any contract, insurance policy, government program, health benefit plan or other plan or program under which Participants are eligible for benefits. Benefit Program shall not include workers' compensation plans and auto medical plans.

   (b) *ValuePoint* Program or Discount Card Program means a non-insured business arrangement under which, in exchange for a fee or other consideration paid by Participant directly to Client, and upon presentation of an identification card bearing the *ValuePoint* logo or other MPI authorized name and/or logo, a Participant has the right to reimburse Network Providers directly at the Contract Rate as payment in full for health care services rendered.

3. Delete Section 5.1, Submission of Claims, in its entirety, and replace it with the following:

   5.1 Submission of Claims. Group will submit claims for payment within one hundred eighty (180) days of furnishing health care services, or as otherwise required by applicable state or federal law, at Group's Billed Charges for such health care services. Claims received after this time period may be denied for payment by Client or User, and Group shall not bill Client, User, MPI or Participant for such denied claims. Group will follow the claims submission procedures contained in the administrative handbook(s). A Clean Claim shall be deemed to have been received by the Client: (i) on the date that such Clean Claim is transmitted to the Client if transmitted by electronic means; or (ii) five (5) calendar days following the deposit of such Clean Claim in the U.S. Mail, first class postage prepaid and addressed to the Client at such address set forth on the Participant's identification card. Upon request, Group shall furnish to Client or MPI, all information reasonably required to verify the health care services provided by Group and the charges for such services.

## EXHIBIT B
## NETWORK PARTICIPATION REQUIREMENTS

I. **NETWORK ACCESS.** The terms of this Agreement shall include Network Access for the Complementary Network only.

II. **COMPLEMENTARY NETWORK PARTICIPATION REQUIREMENTS.** Complementary Network access, including access to Complementary Network Contract Rates, is available only to Clients that have contracted with MPI to utilize the Complementary Network in conjunction with Clients' Benefit Programs either as an extended network or when the Benefit Program does not utilize another network as primary. Complementary Benefit Programs must provide a mechanism encouraging direction of Participants to Network Providers, including, but not limited to, the availability of Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers. Such access shall be indicated on Explanation of Benefits forms (EOBs) pertaining to claims paid at the Complementary Network Contract Rates, and is usually indicated by an MPI Complementary Network authorized name and/or logo on Participants identification. Complementary Benefit Programs may pay for Covered Services at an in- or out-of-network level.

**EXHIBIT C**
**COORDINATING PROVISIONS-STATE/FEDERAL LAW, ACCREDITATION STANDARDS AND GEOGRAPHIC EXCEPTIONS**
**NEW JERSEY**

## I. INTRODUCTION:

1. Scope. To the extent of any conflict between the Agreement and this State Law Coordinating Provisions ("SLCP") Exhibit, this SLCP Exhibit shall supersede, govern and control to the extent required by federal and/or state law and to the extent that MPI, Network Provider and/or Client are subject to such federal or state law.

## II. DEFINITION:

Andyarnp#1

1. Depending upon the specific form of the Agreement, the following terms may be utilized in t intended to be defined as provided for in the Agreement:

(i) Billed Charges may be referred to as Regular Billing Rates;
(ii) Client may be referred to as Payor;
(iii) Contract Rates may be referred to as Preferred Payment Rates;
(iv) Covered Services may be referred to as Covered Care;
(v) Network Provider may be referred to as Preferred Provider;
(vi) Participant may be referred to as Covered Individual; and
(vii) Program or Benefit Program may be referred to as Contract.

2. For purposes of this Exhibit C, the term Network Provider is inclusive of Participating Professional and all Network Providers.

## III. FEDERAL LAW COORDINATING PROVISIONS:

Federal Employees Health Benefits ("FEHB"). As applicable, this Agreement is subject to the terms of the laws governing FEHB.

Federal Employees Health Benefits ("FEHB") Plan. The parties agree that any and all claims or disputes relating to such benefits under a FEHB Plan will be governed exclusively by the terms of such federal government contract and federal law, whether or not such terms and laws are specified in this SLCP Exhibit or elsewhere in this Agreement.

## IV. STATE LAW COORDINATING PROVISIONS: NEW JERSEY

For any Agreement involving the delivery of health care services in the State of New Jersey, the provisions noted below shall apply. Where the term Client is used Client shall mean only those Clients that are subject to the specific law(s) cited below:

1. As required by N.J.A.C. 11:24B-5.2 (a)(1), this Agreement and any amendments hereto are subject to the prior approval of the New Jersey Department of Banking and Insurance ("DOBI") and may not be effectuated without such approval. Notwithstanding the preceding, the following types of amendments do not require prior approval of DOBI:
   (i) amendments that are of a clerical nature;
   (ii) amendments that alter numbers, be they dollar amounts, enrollment amounts or the like, without altering methodologies from which the numbers were derived; and
   (iii) amendments that involve the substitution of one set of variable text for another set of variable text, if both sets of variable text were previously approved by DOBI for this Agreement.

2. As required by N.J.A.C. 11:24B-5.2 (a)(2), any provision of this Agreement that conflict with applicable federal or state laws are hereby amended to conform to such applicable federal or state law.

3. As required by N.J.A.C. 11:24B-5.2 (a)(3), MPI shall provide Network Provider with a minimum of thirty (30) calendar days notice of any amendment to this Agreement. Notwithstanding the preceding, such notice is not required in the event the amendment is required due to a change in applicable federal or state laws or regulations or such amendment does not constitute a material change. For purposes of this provision a material change is a change that substantially impacts the rights or obligations of Network Provider.

**EXHIBIT C**
**COORDINATING PROVISIONS-STATE/FEDERAL LAW, ACCREDITATION STANDARDS AND GEOGRAPHIC EXCEPTIONS**
**NEW JERSEY**

4. As required by N.J.A.C. 11:24B-5.2 (a)(7)(5), Network Provider may rely upon the written or oral authorization for Covered Services if made by Client or MPI. Covered Services shall not be retroactively denied as not medically necessary except in cases of material misrepresentation of the facts or fraud to Client or MPI.

5. As required by N.J.A.C. 11:24B-5.2 (a) (9), this Agreement is governed by New Jersey law.

6. As required by N.J.A.C. 11:24-5.2 (a)(17), Network Provider shall not be terminated or otherwise penalized because of complaints or appeals that Network Provider files on Network Provider's behalf, or on behalf of Participants, or for otherwise acting as an advocate for Participants in seeking appropriate, medically necessary Covered Services.

7. As required by N.J.A.C. 11:24B-5.2 (a)(20), Network Provider may submit and seek resolution of a complaint or grievance to MPI for review and resolution, if applicable. Such resolution shall not exceed thirty (30) calendar days. In the event Network Provider is not satisfied with the resolution of the complaint or grievance, Network Provider may submit the complaint or grievance to the New Jersey Department of Health and Senior Services, New Jersey Department of Banking and Insurance or the New Jersey Department of Human Services

8. As required by N.J.A.C. 11:24B-5.3, in the event MPI terminates this Agreement, MPI shall provide Network Provider with notice, specifying the reason(s) for such termination. Network Provider may, in writing, request a hearing to appeal the termination, except if the termination (1) occurs on the Renewal Date; or (2) is due to the Network Provider's breach or alleged fraud; or (3) in the opinion of MPI, the Network Provider poses and imminent danger to Participant(s), or the public health, safety, or welfare.

9. As required by N.J.A.C. 11:24A-4.9, in the event Network Provider requests a hearing pursuant to N.J.A.C. 11:24B-5.3, Network Provider shall request such hearing, in writing, within thirty (30) days of the date of the notice of termination. MPI shall hold such hearing within thirty (30) days following receipt of a written request for a hearing by the terminated Network Provider before a panel appointed by MPI. Such panel shall consist of at least three (3) people, one of which shall be a clinical peer in the same or substantially similar discipline and specialty as Network Provider requesting the hearing. MPI shall render a decision in writing within thirty (30) days of the close of the hearing unless MPI provides notice to Network Provider of a need for an extension of time to render its determination. The written determination notice shall set forth the relevant contract provisions and the facts upon which MPI and Network Provider have relied at the hearing and shall state whether Network Provider is terminated or reinstated and shall include MPI's reasons for such determination. In the event Network Provider is reinstated, MPI shall state the impact of the reinstatement upon the terms of the duration of the Agreement.

10. As required by N.J.A.C. 11:24B-5.3 (f), in the event this Agreement is terminated, Network Provider, if a physician, shall:
    (i) continue to provide health care services for up to four (4) months following the effective date of such termination in cases where it is medically necessary for the Participant to continue treatment with the Network Provider;
    (ii) in the case of pregnancy of a Participant, through postpartum evaluation of the Participant, up to six (6) months after delivery;
    (iii) in the case of post-operative care, up to six months following the effective date of the termination;
    (iv) in the case of oncological treatment, up to one (1) year following the effective date of the termination; or
    (v) in the case of psychiatric treatment, up to one year following the effective date of termination.

11. As required by the Department of Banking and Insurance Bulletin No.: 06-16, in the event of an appeal of a claim determination, Client shall accept the Health Care Provider Application to Appeal a Claims Determination form and shall post such form on its website.

**EXHIBIT C**
**COORDINATING PROVISIONS-STATE/FEDERAL LAW, ACCREDITATION STANDARDS AND GEOGRAPHIC EXCEPTIONS**
**NEW JERSEY**

12. As required by N.J.S.A. § 45:1-10.1, in the event of a claim in which the Participant has assigned his /her benefits to Network Provider, the Network Provider shall submit the claim for payment within 180 days of furnishing health care services.

13. As required by N.J.A.C. 11:22-1.5(a), a Clean Claim is received on the date of actual receipt by the Client.

14. As required by N.J.S.A. §17B:27-44.2(d)(1), Client shall within thirty (30) calendar days of receipt of a Clean Claim, pay or arrange for User to pay Facility for Covered Services, as full compensation, the Contract Rate in accordance with the terms of this Agreement and the administrative handbook(s), in order to obtain the benefit of the Contract Rate.

15. As required by N.J.A.C. 11:24B-5.2(a)(19)(ii), in the event a Clean Claim is not timely paid to Network Provider, Client or User, as applicable, shall be responsible for remitting the interest payment required by New Jersey laws and regulations to Network Provider. In no event shall Network Provider be required to request payment of such interest from Client or User, as applicable, as a condition of receiving such interest payment.

16. As required by N.J.S.A §17B:27-44.2(d)(10), with the exception of claims that were submitted fraudulently or submitted by Network Provider that have a pattern of inappropriate billing or claims that were subject to coordination of benefits, no Client or User, as applicable, shall seek reimbursement for overpayment of a claim previously paid later than 18 months after the date the first payment on the claim was made. No Client or User, as applicable, shall seek more than one (1) reimbursement for overpayment of a particular claim. At the time the reimbursement request is submitted to the Network Provider, the Client or User, as applicable, shall provide written documentation that identifies the error made by the Client or User, as applicable, in the processing or payment of the claim that justifies the reimbursement request. No Client or User, as applicable, shall base a reimbursement request for a particular claim on extrapolation of other claims, except under the following circumstances:

(i) in judicial or quasi-judicial proceedings, including arbitration;

(ii) in administrative proceedings;

(iii) in which relevant records required to be maintained by the Network Provider have been improperly altered or reconstructed, or a material number of the relevant records are otherwise unavailable; or

(iv) in which there is clear evidence of fraud by the Network Provider and the Client or User, as applicable, has investigated the claim in accordance with its fraud prevention plan and referred the claim, together with supporting documentation, to the Office of the Insurance Fraud Prosecutor in the Department of Law and Public Safety.

## V. ACCREDITATION STANDARDS COORDINATING PROVISIONS:

There are no Accreditation Standards Coordinating Provisions at this time.

## VI. GEOGRAPHIC EXCEPTIONS COORDINATING PROVISIONS:

There are no Geographic Exceptions Coordinating Provisions at this time.

**EXHIBIT D**
**CONTRACT RATES**

## I. BILLING & PAYMENT

1.1 Code Updates. MPI will, on an annual basis and without prior notice, add any newly assigned CPT or HCPCS codes, change any existing CPT or HCPCS codes, and/or delete any obsolete CPT or HCPCS codes in accordance with industry standards.

1.2 Charge Master Cap.

(i) Charge Master Notice. As of December 1st of each calendar year, Group will provide to MPI, written notice specifying whether there has been a change in the Group's charge master ("Charge Master Notice"). In the event that there is an increase in the Group's charge master, such Charge Master Notice will include the average annual increase in Group's overall charge master for the current year as compared to the previous year.

(ii) Percentage Contract Rate Adjustment. If in any calendar year, the average increase in the Group's overall charge master (Actual Percentage Increase) is greater than **five (5%) percent** (the "Charge Master Cap"), any Contract Rate specified in this Agreement as a percentage of Group's Billed Charges shall be adjusted according to the following formula:

(1+ lower of the Charge Master Cap or the Actual Percentage Increase) divided by
(1+ Actual Percentage Increase) multiplied by the original Contract Rate

(iii) Cumulative Adjustments. In each successive year, adjustments of the Contract Rate shall be cumulative. Group shall be responsible for reporting to MPI annually any Actual Percentage Increase in its charge master.

(iv) Charge Master Review. Upon fifteen (15) days prior written notice to the Group by MPI, MPI may review the supporting documentation utilized by Group with regard to the information provided by Group in the Charge Master Notice ("Charge Master Review"). Group agrees to cooperate fully during such Charge Master Review. Based on the findings from such Charge Master Review, MPI may increase any Contract Rate per the Charge Master Cap provision specified herein.

## II. CONTRACT RATES

2.1 Contract Rates – Percentage of Billed Charges. Except as otherwise specified herein, the Contract Rate for Covered Services rendered to Participants shall be equal to **eighty five (85%) percent** of Group's Billed Charges, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the Participant's Benefit Program.

MultiPlan.

January 15, 2018
Cyrus Loghmanee MD
East Coast Advanced Plastic Surgery LLC
180 Grand Avenue
Englewood, NJ 07631

**Important: Notice of Material Fee Schedule Change/Amendment to Contract**

Multiplan, Inc. ("MPI") values your network participation and in an effort to ensure that your Contract Rates are aligned with the most current industry standards, we are providing you notice of an update to your reimbursement. Pursuant to Section 9.2 of your MPI Group Agreement, please find the updated Exhibit D, Contract Rates, and effective February 15, 2018.

We have observed clients taking a more active role in managing their access to MultiPlan networks, as they do their proprietary or other leased networks. We also note a trend toward use of reference-based pricing and other programs that threaten to eliminate the use of networks altogether. To help ensure the continued effectiveness of your network participation, and to minimize confusion in the face of these changing practices, this notification is intended to update and clarify the following terms with regard to your agreement:

- Your agreement with Multiplan is governed by each client's benefit plan and reimbursement policies. This means, for example, that if the benefit plan or reimbursement policy sets a maximum amount the plan will pay, the terms of your agreement may not apply to a specific claim if the agreed contract rate for that claim is above this maximum amount.

- MultiPlan clients (and their customers) are not required to access every network offered by MultiPlan, or to access every provider participating in the network(s) they do access. Therefore, MultiPlan clients (and their customers) may elect to not access your agreement and in those situations the terms of your agreement will not apply. This may happen under a number of circumstances including but not limited to: claim-specific conditions like the one described above; exclusion of certain participating providers, specialties or conditions (e.g. diagnostics, dialysis, hemophilia, etc.); and when clients have direct contracts with your organization which take precedence over the Multiplan arrangement.

- Under your agreement you are obligated to bill in accordance with industry-accepted coding and bundling rules and are subject to claim edits which may be performed by Multiplan and/or our clients in accordance with these rules. In addition, providers will not be reimbursed for procedures that MultiPlan and/or our clients determine, based on industry standard coding rules, to be fraudulent, wasteful or abusive.

We have revised our administrative handbook(s) to include the same updates and clarifications included in this letter. For a copy of the handbook(s), which as a network provider you are required to comply with, visit our website at multiplan.com/providers/education/.

As a reminder, our clients may access our networks for a variety of program types, including commercial health benefit programs and medical benefits associated with property and casualty insurance (such as workers' compensation, auto medical and homeowner's insurance programs). Depending on your participation, these changes apply to all services provided to members accessing your agreement(s) with MultiPlan. Additional terms regarding your reimbursement are included in the *MultiPlan Network Provider Handbook* available in the Providers section of www.multiplan.com .

On behalf of everyone at MultiPlan, thank you for your continued participation in our provider networks. If you have any questions regarding your Agreement, please do not hesitate to conact me at Sandra.Bonola@Multiplan.com or (860-255-7703).

*Sandra Bonola*

By Chris

**EXHIBIT D**
**CONTRACT RATES**

## I. BILLING & PAYMENT

1.1 Code Updates. MPI will, on an annual basis and without prior notice, add any newly assigned CPT or HCPCS codes, change any existing CPT or HCPCS codes, and/or delete any obsolete CPT or HCPCS codes in accordance with industry standards.

1.2 Charge Master Cap.

(i) Charge Master Notice. As of December 1st of each calendar year, Group will provide to MPI, written notice specifying whether there has been a change in the Group's charge master ("Charge Master Notice"). In the event that there is an increase in the Group's charge master, such Charge Master Notice will include the average annual increase in Group's overall charge master for the current year as compared to the previous year.

(ii) Percentage Contract Rate Adjustment. If in any calendar year, the average increase in the Group's overall charge master (Actual Percentage Increase) is greater than **Five (5%) percent** (the "Charge Master Cap"), any Contract Rate specified in this Agreement as a percentage of Group's Billed Charges shall be adjusted according to the following formula:

((1+ lower of the Charge Master Cap or the Actual Percentage Increase) divided by
(1+ Actual Percentage Increase)) multiplied by the original Contract Rate

(iii) Cumulative Adjustments. In each successive year, adjustments of the Contract Rate shall be cumulative. Group shall be responsible for reporting to MPI annually any Actual Percentage Increase in its charge master.

(iv) Charge Master Review. Upon fifteen (15) days prior written notice to the Group by MPI, MPI may review the supporting documentation utilized by Group with regard to the information provided by Group in the Charge Master Notice ("Charge Master Review"). Group agrees to cooperate fully during such Charge Master Review. Based on the findings from such Charge Master Review, MPI may increase any Contract Rate per the Charge Master Cap provision specified herein.

1.3 Billing and Payment Requirements. Payment by Client or User, as applicable, shall be subject to this Exhibit D, the Participant's Benefit Program, the administrative handbook(s), and the application of industry standard coding and bundling rules, modifiers, and/or edits. In addition, any payments due by Client or User, as applicable, under this Agreement shall be reduced by any service or procedure which is deemed by MPI and/or Client/User to be fraudulent, wasteful, abusive, or inconsistent with generally accepted clinical practices.

1.4 Multiple Procedure Payment Rules. Unless otherwise required by law, in the event that multiple procedures are included on the claim, Client will pay or arrange for User to pay (i) one hundred (100%) percent of the applicable Contract Rate for the procedure with the highest Contract Rate, and (ii) a reduced percentage of the Contract Rate, as determined by MPI, for any additional procedures thereafter. MPI may, in its sole discretion modify the codes subject to a multiple procedure payment reduction (e.g. surgical, diagnostic, therapy, etc.), as well as the percentage reduction applicable to such multiple procedures, which are based in part on CMS guidelines. Upon request from Group, MPI will provide to Group the specific codes administered by MPI that are subject to a multiple procedure payment reduction and/or the current percentage reduction applicable when multiple procedures are included on the claim.

## II. CONTRACT RATES

2.1 Contract Rates – Percentage of Billed Charges. Except as otherwise specified herein, the Contract Rate for Covered Services rendered to Participants shall be equal to **Seventy-Five (75%) percent** of Group's Billed Charges, less any co-payments, deductibles, and co-insurance, if any, as specified in the Participant's Benefit Program.

Replaces Exhibit D from Original Contract